STATE OF VERMONT

SUPERIOR COURT

ENVIRONMENTAL DIVISION
Docket No. 140-11-15 Vtec

| | |
|---|---|
| Rublee 246 White Birch Lane CU | DECISION ON THE MERITS |

This matter concerns an application by Appellant Lynn Rublee for conditional use approval to use part of her single-family home at 246 White Birch Lane in the Town of Derby, Vermont (Town) as a bed and breakfast.  Ms. Rublee submitted her conditional use application to the Town Development Review Board (DRB), and the DRB reviewed Ms. Rublee's application under the six conditional use criteria in Section 208.4 of the Town of Derby Zoning Bylaw (Bylaws).  The DRB determined that the conditional use would not have an undue adverse effect on existing or planned community facilities, renewable energy resources, or the Town's Bylaws, satisfying three requirements of Section 208.4.  The DRB denied the conditional use application, finding that the bed and breakfast would have an adverse impact on the character of the area; area roads and highways; and the public health, safety, and welfare.

Ms. Rublee appealed that determination to this Court.[1]  Several Neighbors—Troy Schumacher, Deborah Brooks, Peter Brooks, Mark Rublee, Jacques Dupont, Charles Curtiss, Nancy Curtiss, and Marina Dupuy—appeared as self-represented interested parties.  The Town also appeared through Attorney Amanda Lafferty.  Ms. Rublee filed an initial Statement of Questions on December 14, 2015, then amended her Statement of Questions on January 11, 2016 and again on January 21, 2016.  Her final Statement of Questions had seven questions with various subparts.

In a status conference on February 22, 2016, the Court dismissed Questions 1 and 7.  At an April 18, 2016 status conference, the Court granted Ms. Rublee's motion to withdraw Questions 3(A), 4(A), 4(B), and 5(A).  Remaining before the Court are Questions 2, 3, 4, and 5,

---

[1] In the initial stages of this matter, Ms. Rublee was self-represented.  Prior to the February 22, 2016 status conference, Ms. Rublee retained Attorney Chad Hickey to represent her in this matter.

which ask, respectively, whether the bed and breakfast satisfies conditional use standards; whether it will have an undue adverse effect on the character of the area; whether it will have an undue adverse effect on area roads and highways; and whether it will have an undue adverse effect on the public health, safety, and welfare.

The Court held a site visit and one-day merits hearing in this matter on July 13, 2016. The hearing was held at the Vermont Superior Court for Orleans County in Newport, Vermont. Several days before the hearing, all self-represented interested parties except Marina Dupuy and Mark Rublee withdrew from the matter. Participating were Lynn Rublee, represented by Chad Hickey, Esq. and the Town of Derby, represented by Amanda Lafferty, Esq. Mark Rublee attended the site visit and hearing, but did not actively participate. Marina Dupuy did not attend the site visit or hearing.

Based on the evidence submitted at trial, which was put into context by the site visit, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1.      Appellant Lynn Rublee lives at 246 White Birch Lane in the Town of Derby, Vermont.

2.      Ms. Rublee purchased her single-family home at 246 White Birch Lane in 2013. The home has three bedrooms and 1¾ baths. Ms. Rublee lives in the home year round.

3.      The house is located in the Town's Shoreland District and is adjacent to Lake Memphremagog.

4.      Ms. Rublee began operating a bed and breakfast in July 2015 by renting two of the three bedrooms in her house through the website AirBnB. Ms. Rublee did not believe she needed Town approval for AirBnB rentals.

5.      Sometime in late summer or fall of 2015, the Town zoning administrator informed her that she need a permit to rent rooms through AirBnB. She ceased renting in October 2015 while she applied for Town approval.

6.      Ms. Rublee applied for conditional use approval, and the DRB denied her application on October 26, 2015.

7.      Ms. Rublee appealed that decision to this Court.

2

8. On appeal, Ms. Rublee seeks conditional use approval to operate a two-room bed and breakfast at her property.

9. Ms. Rublee's bed and breakfast would house up to four guests per night.

10. Ms. Rublee generally has a positive relationship with her renters. They are typically quiet and respectful.

11. Ms. Rublee's guests generally seek accommodations while they vacation in the area. Some of her renters are from out of state, some are Vermonters from other parts of the state.

I. Character of the Area

12. Ms. Rublee's property is Lot 9 of a ten-lot subdivision that received an Act 250 permit in 1983 (the Subdivision).

13. After the initial Act 250 permit, two of the lots in the Subdivision were further subdivided into four lots, totaling twelve lots in the Subdivision.

14. The Subdivision is bordered by North Derby Road to the east and Lake Memphremagog to the west.

15. The lots in the Subdivision have access to North Derby Road via White Birch Lane, which runs west from North Derby Road through the subdivision and terminates at the Rublee lot.

16. The traveled portion of the White Birch Lane right-of-way is 11 feet wide.

17. All residents of the Subdivision share general maintenance costs, and year-round residents share the costs of winter maintenance.

18. There are presently seven homes in the twelve-lot Subdivision.

19. Four homes—the Stratton, Stanley, Brooks, and Rublee homes—are used as primary residences. They are occupied year-round or nearly year-round.

20. Two homes—the Curtiss and Dupuy homes—are second homes; they are not occupied year round. The Dupuy home is occasionally rented to friends and family.

21. One home—the Penney property—is rented to various people year round. The house is 3,000 square feet, and it sleeps up to ten people. Ms. Rublee has seen up to five cars parked on the Penney lot at a time.

22. Five lots have no homes on them.

23. One of these five lots is owned by Jacques Dupont, who puts a mobile trailer on his lot in the summer months. Another is owned by the Smiths, who do the same. A third is owned by the Brookses. This lot adjoins the Brookses' house, and is vacant. The fourth is owned by the Strattons. This lot adjoins the Strattons' house, and is vacant. The fifth is owned by the Penney family. This lot lies across a small lane from the other Penney lot (the lot with the Penney home on it), and it is also vacant.

24. Ms. Rublee's lot is bordered by White Birch Lane to the south and a former railroad line to the west.

25. The railroad line has been converted into a rail trail that runs from Newport to the Canadian border. It is open for recreational use. Motorized vehicles are prohibited. The rail trail is heavily used in the area near the Subdivision.

26. Lake Mephremagog lies to the west of the rail trail. Ms. Rublee leases a sand beach on Lake Memphremagog from the State of Vermont. She also leases a strip of land that crosses the rail trail and connects her lot to the beach.

27. There is another portion of beach on Lake Memphremagog that is open for use by some residents of the Subdivision.

28. Immediately to the south of the Subdivision is a vacation area known as Cousins Beach.

29. The Cousins Beach area is made up of sixteen small cottages that are used during the summer months.

30. Approximately five of these cottages are open to the general public as rental properties.

31. Cousins Beach residents use the beach area just south of the Subdivision's beach area.

32. Cousins Lane connects the Cousins Beach area to North Derby Road. Cousins Lane is parallel to White Birch Lane. A strip of land about twenty-five feet wide separates the two roads.

33. Cars traveling up and down Cousins Lane can be viewed from many of the residences on White Birch Lane.

34. During the winter months, there is a Vermont Association of Snowmobile Travelers (VAST) snowmobile trail that comes across North Derby Road at an angle, travels across a field to the south of Cousins Lane, then crosses Cousins Lane at a point near the Brooks residence. The trail

then travels down Cousins Lane and across Lake Memphremagog.  The trail is heavily traveled in winter when snow covered.

II.     Traffic

35.     Ms. Rublee seeks approval to rent two of the three bedrooms in her house on a nightly basis.

36.     Historically, she has rented her rooms for about ten nights per month, on average.

37.     Guests typically take one or two round trips a day by vehicle away from the residence (totaling two or four one-way trips).

38.     The sole access road for Ms. Rublee's house is White Birch Lane.

39.     White Birch Lane runs from Ms. Rublee's house east to North Derby Road.  At North Derby Road, White Birch Lane forms a "T" intersection.  There are no intersection or stopping sight distance problems at the North Derby Road/White Birch Lane intersection.

40.     From North Derby Road, White Birch Lane is flat and straight for roughly 100 feet.  It then dips down at a grade of 10 to 15% for the next 100 feet, after which it levels off and curves to the right (north) and approaches Ms. Rublee's house.

41.     The posted speed limit for White Birch Lane is 10 miles per hour on the flat portion of the road and 5 miles per hour on the incline.

42.     When cars on the road meet, one car has to move over to pass.

43.     Cars have been safely using this system since 1983.

44.     Many more cars use Cousins Lane than White Birch Lane to access North Derby Road. Cousins Lane is the same width as White Birch Lane.

45.     The first 100 feet of White Birch Lane is in good condition, but there is a lack of crown in the road on the incline portion, which is causing water to stagnate and erode the roadway.

46.     Ms. Rublee hired an engineering consultant to evaluate the condition of her road.

47.     The road consultant recommends adding a gravel crown of 3–4% to address the drainage issue.

48.     The road erosion problems on this portion of the road are longstanding. The additional traffic generated by Ms. Rublee's proposed bed and breakfast will have a negligible effect on the road.

III.    Public Health, Safety, and Welfare

49.    Ms. Rublee's home has a septic system. She received a certificate of compliance from the State of Vermont Agency of Environmental Conservation for her septic system.

50.    Bed and breakfasts are subject to certain fire and food regulations.

51.    Ms. Rublee has been in contact with the Town fire marshal, and has arranged to do what the marshal requires to comply with fire code.

52.    Ms. Rublee prepares continental breakfast for her renters, but it does not involve cooking. Ms. Rublee gives out kitchen privileges to guests on an as-needed basis.

53.    Ms. Rublee is generally on-site while renters are there. She is responsible for ensuring guest safety.

**Conclusions of Law**

Ms. Rublee seeks conditional use approval for operation of a bed and breakfast out of her home in the Town of Derby's Shoreland District. Under the Town of Derby's Zoning Bylaw (Bylaws),[2] conditional use applicants must demonstrate that their uses will not have undue adverse effects on: (1) the capacity of community facilities; (2) the character of the area; (3) traffic; (4) the Town's Bylaws; (5) renewable energy resources; and (6) the general public health, safety, and welfare. Bylaws § 208.4(A)–(F).

The DRB found that the bed and breakfast would not have an undue adverse effect on elements 1, 4, and 5. No one appealed those determinations, and they are therefore final. The issues before the Court, which are raised in Ms. Rublee's Statement of Questions, are whether the bed and breakfast will have an undue adverse effect on the character of the area; traffic on roads and highways in the vicinity; and the general public health, safety, and welfare.

I.    Character of the Area (Question 3)

The first issue is whether the bed and breakfast will have an undue adverse effect on the character of the area. See Bylaws § 208.4(B). There was some dispute in pre-trial motions, at trial, and in the post-trial briefs over the proper standard for evaluating the character of the area. We will address these legal arguments first, then apply the standard to Ms. Rublee's application.

_____
[2] Admitted at trial as Exhibit 10.

6

a.    *Legal Standard for "Character of the Area"*

The Town's conditional use standards provide that conditional uses must not adversely affect "the character of the area involved."  Bylaws § 208.4(B).  The statute empowering towns to regulate conditional uses provides that towns' conditional use standards

> [S]hall require that the proposed conditional use shall not result in an undue adverse effect on . . . the character of the area affected, *as defined by the purpose or purposes of the zoning district within which the project is located, and specifically stated policies and standards of the municipal plan*.
>
> 24 V.S.A. § 4414(3)(A)(ii) (emphasis added).

The Town argues that the emphasized language in the statute means that the *only* permissible metric for determining the "character of the area" is purpose statements in town plans and bylaws.  At trial, the Town therefore objected to evidence of existing uses in the Shoreland District, and it urges us to ignore this evidence in our decision.  Ms. Rublee, on the other hand, argues that the statutory standard for conditional uses is merely a "floor" for municipal regulations, and that Towns are free to pass more restrictive standards.  It argues that the Town has done so here, and that its Bylaws require conditional uses to harmonize with both purpose statements and existing uses.

We agree with Mr. Rublee's interpretation of the bylaw and the statute.  The statutory language in 24 V.S.A. § 4414 sets a "floor" for municipalities' conditional use regulations, but it does not displace the requirements of municipal bylaws.  See In re Hurricane Auto CU Permit, No. 92-7-11 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Oct. 12, 2012) (Walsh, J.) (quoting In re White, 155 Vt. 612, 619–20 (1991)).  While towns' regulations must, at the very least, ensure that conditional uses will not have an undue adverse effect on the character of the area "as defined by the purpose or purposes of the zoning district," the regulations may *also* require that conditional uses not have an undue adverse effect on the character of the area as it actually exists.  See, e.g., id.; In re Twin Pines Housing Trust Conditional Use, No. 95-7-77 Vtec, slip op. at 10 (Vt. Envtl. Ct. Sept. 20, 2012) (examining a conditional use bylaw requiring conformity with purpose statements and existing uses).

Before 2004, the statute empowering towns to regulate conditional uses provided only that towns' conditional use standards "shall require that the proposed conditional use shall not

7

adversely affect . . . the character of the area affected." See 2004, No. 115, § 109, codified at 24 V.S.A. § 4414(3)(A)(ii). The Legislature added the language defining "character of the area" by "the purpose or purposes of the zoning district" in 2004 as part of the Permit Reform Act. See id. The 2004 amendments gave towns until September 1, 2011 to amend their bylaws to "conform with the provisions of this chapter." See 2004, No. 115, §§ 95, 109, codified at 24 V.S.A. §§ 4414(3), 4481.

The Town of Derby's Bylaws use the language from the pre-2004 statute, and simply provide that conditional uses must not "adversely affect . . . the character of the area involved."[3] Bylaws § 208.4(B). The Town amended its Bylaws after 2011, and its decision to keep the broader language from the pre-2004 statute presumably represents a conscious choice not to restrict the definition of "character of the area" to just purpose statements, and to maintain the pre-2004 meaning of "character of the area." See Robes v. Town of Hartford, 161 Vt. 187, 193 (1993) ("[W]e presume that the legislature chose its words advisedly.").

The meaning of "character of the area" before the 2004 amendments was the character of the area as it actually exists, rather than as it is defined in the abstract. See, e.g., In re Licausi, No. 203-11-98 Vtec, slip op. at 2 n.2 (Vt. Envtl. Ct. Nov. 4, 2005) (Wright, J.), aff'd 182 Vt. 647 (noting that, because the 2004 amendments were not applicable to the application before the Court, "character of the area remains assessed as including the working landscape as the area currently exists, with all approved uses."). Cf. In re Meaker, 156 Vt. 182, 185 (1991); In re Gaboriault, 167 Vt. 582, 584–85 (1997); In re Miller, 170 Vt. 64, 69 (1999); In re Sardi, 170 Vt. 623, 625 (2000) (all affirming character-of-the-area reviews in which the lower court examined existing uses).

We have looked to existing uses to determine character of the area in virtually every post-2004 conditional use case involving bylaws that, like the Town's, maintain the pre-2004 statutory language. In re Mansfield Prof. Bldg. PRD Final Plat Application, No. 260-11-07 Vtec, slip op. at 14–15 (Vt. Envtl. Ct. Dec. 9, 2008) (Durkin, J.); In re Woodstock Cmty. Trust, No. 203-10-09 Vtec,

---

[3] The Bylaws are not invalid for failing to update the conditional use provisions after 2004. The 2004 amendments required that towns amend their bylaws to "conform" to the new statute by September 1, 2011. 24 V.S.A. § 4481. As we discuss in this opinion, the Bylaws do conform, since they comply with the statutory floor in 24 V.S.A. § 4414(3).

slip op. at 13–15 (Vt. Super. Ct. Envtl. Div. Oct. 14, 2011) (Wright, J.); In re Champlain Oil Conditional Use Application, No. 89-7-11 Vtec, slip op. at 7–8, 34 (Vt. Super. Ct. Envtl. Div. Oct. 10, 2012) (Durkin, J.), aff'd 2014 VT 19, 196 Vt. 29; In re Grp. Five Invs. CU Permit, No. 34-3-11 Vtec, slip op. at 13 (Vt. Super. Ct. Envtl. Div. Oct. 24, 2012) (Durkin, J.), aff'd 2014 VT 14, 195 Vt. 625; In re Whiteyville Props., LLC, No. 179-12-11 Vtec, slip op. at 9–10 (Vt. Super. Ct. Envtl. Div. Dec. 19, 2013) (Durkin, J.); In re Zaremba Grp. Dollar General CU Permit, No. 32-3-14 Vtec, slip op. at 11–15 (Vt. Super Ct. Envtl. Div. Dec. 22, 2014) (Walsh, J.); In re Margaret Pratt Assisted Living Site Plan, Conditional Use and Act 250 Approvals, Nos., 111-8-14 Vtec, 112-8-14 Vtec, 13-2-15 Vtec, and 100-8-15 Vtec, slip op. at 15 (Vt. Super. Ct. Envtl. Div. June 21, 2016) (Durkin, J.).[4] We have even looked to existing uses when reviewing conditional uses under bylaws that mimic the post-2004 statutory language, defining "character of the area" by purpose statements in town plans and bylaws. See In re Willowell Found. CU, No. 142-10-12 Vtec, slip op. at 3, 22 (Vt. Super. Ct. Envtl. Div. July 10, 2014) (Walsh, J.), aff'd 2016 VT 12.

Nothing in the conditional use statute prohibits the Town from carrying forward the pre-2004 meaning of "character of the area," provided its bylaws also require harmony with purpose statements in town plans and bylaws. See In re Hurricane Auto CU Permit, No. 92-7-11 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Oct. 12, 2012) (Walsh, J.) (quoting In re White, 155 Vt. 612, 619–20 (1991)). Furthermore, even when a bylaw does not satisfy the "floor" in the conditional use statute, the Court will simply read the required statutory standards into the ordinance, and treat the bylaws as an additional restriction. In re White, 155 Vt. 612, 620 (1990).

---

[4] In In re Zaremba Grp. Dollar General CU Permit, an on-the-record appeal, the DRB interpreted a bylaw identical to the Bylaws in this case to be "synonymous" with the statute. No. 32-3-14 Vtec at 11 (Dec. 22, 2014). We affirmed that legal conclusion, but we also affirmed the DRB's factual findings comparing the proposed conditional uses to existing uses in the area. Id. at 12–15.

In In re Mansfield Professional Building and In re Woodstock Community Trust, we analyzed bylaws identical to the Bylaws in this case, but suggested that, under 24 V.S.A. § 4414, the only gauge for character of the area is purpose statements in town plans and bylaws. In re Mansfield Prof. Bldg. PRD Final Plat Application, No. 260-11-07 Vtec, slip op. at 14–15 (Vt. Envtl. Ct. Dec. 9, 2008) (Durkin, J.); In re Woodstock Cmty. Trust, No. 203-10-09 Vtec, slip op. at 13–15 (Vt. Super. Ct. Envtl. Div. Oct. 14, 2011) (Wright, J.). Despite this suggestion, we ultimately looked to existing uses to support our character-of-the-area analysis in both cases. Mansfield, No. 260-11-07 Vtec at 14–15 (Dec. 9, 2008); Woodstock, No. 203-10-09 Vtec at 13–15 (Oct. 14, 2011).

We therefore interpret the Bylaws' character-of-the-area standard to mean that proposed conditional uses in the Town must harmonize with existing uses and with purpose statements in the town Bylaws and plan. The Town's Bylaws therefore require conditional uses to satisfy a two-prong test: if a proposed conditional use will have an undue adverse impact on either existing uses or a purpose statement, it will fail conditional use review.

Reading between the lines of the Town's argument, the Town is concerned that, by allowing evidence of existing uses to come in at trial, the Court might approve conditional uses that harmonize with existing uses, even if it does not comply with purpose statements for the district. But, under our two-pronged interpretation, a conditional use that harmonized with existing uses but did not comply with a purpose statement would not receive conditional use approval. This interpretation is actually stricter than the interpretation the Town offers, because conditional uses must satisfy two requirements instead of one.

Our interpretation is also stricter because purpose statements in town plans and bylaws are often broad and aspirational; they do not offer concrete standards to measure conditional uses against. We have held that it is permissible to require conditional uses to comply with broad, aspirational purpose statements, even when those purpose statements are the kind of "nongregulatory abstractions" we would refuse to enforce directly. See In re Gilmore LLC 5-Lot Subdivision Conditional Use Application, No. 131-8-10 Vtec, slip op. at 11 & n.8 (Vt. Super. Ct. Envtl. Div. Feb. 9, 2012) (citing In re JAM Golf, LLC, 2008 VT 110, ¶¶ 14, 16–17, 185 Vt. 201). But the task of measuring proposed uses against broad standards is still a difficult one,[5] and it is rare that a conditional use actually fails under the purpose prong of character-of-the-area review. Looking to existing uses in addition to purpose statements is therefore sound regulatory policy. It gives teeth to the character-of-the-area requirement, and it gives reviewing tribunals—and applicants—concrete standards to measure proposed uses against.

---

[5] Two of our cases discussed in footnote 5—In re Mansfield Professional Building PRD Final Plat Application and In re Woodstock Community Trust—illustrate this difficulty. In both cases, we suggested that, after the 2004 amendments, the only permissible metric for "character of the area" is purpose statements in town plans and bylaws. In re Mansfield Prof. Bldg. PRD Final Plat Application, No. 260-11-07 Vtec, slip op. at 14–15 (Vt. Envtl. Ct. Dec. 9, 2008) (Durkin, J.); In re Woodstock Cmty. Trust, No. 203-10-09 Vtec, slip op. at 13–15 (Vt. Super. Ct. Envtl. Div. Oct. 14, 2011) (Wright, J.). But then, in both cases, our analysis ends up referencing existing uses for support, likely because there is so little to analyze when comparing a proposed use to broad, aspirational purpose statements. See Mansfield, No. 260-11-07 Vtec at 14–15 (Dec. 9, 2008); Woodstock, No. 203-10-09 Vtec at 13–15 (Oct. 14, 2011).

We therefore conclude that, in the Town of Derby, conditional uses must not adversely affect the character of the area, as it is defined in the Bylaws or as it exists in reality. We will therefore compare Ms. Rublee's bed and breakfast to both the purpose statement for the Shoreland District and the existing uses in the area.

b. *Whether Ms. Rublee's Bed and Breakfast Will Have an Undue Adverse Effect on Character of the Area*

Ms. Rublee's bed and breakfast will not have an undue adverse effect on the character of the area, as defined either by the purpose statement of the Shoreland District or the existing uses in the area.

The Bylaws express the following purpose for the Shoreland District:

[T]o provide for the protection of public waters, control of water pollution, preservation of shore cover and natural beauty, and for the maintenance of safe and healthful conditions which will provide for multiple uses of waters in a manner that provides for the best interest of the citizens of the state. As such, the location and setbacks of septic tanks and leach fields are regulated in addition to any state regulations that may apply.

Bylaws § 206.9 (expressing the "objective" for the zoning district). This purpose does not provide any specific or concrete prohibition. It merely reflects an attempt to balance conservation of shore land and "multiple uses of waters," and it references regulations regarding septic tanks.

To the extent this purpose statement imposes enforceable limits on conditional uses in the Shoreland District, Ms. Rublee's bed and breakfast is within these limits. Her bed and breakfast involves no new construction, and it will be a low-impact way of increasing access to the water while at the same time conserving open space. She has the necessary state permits for her septic tank, and there was no suggestion that her septic tank violated municipal standards. We cannot say that the bed and breakfast will upset the balance between conservation and recreation envisioned for the Shoreland District, or that Ms. Rublee's bed and breakfast will have an undue adverse effect on this purpose.

We also conclude that Ms. Rublee's bed and breakfast will be consistent with existing uses in the area. The Shoreland District contains a mix of year-round homes, seasonal second homes, and short-term vacation rentals. It is also heavily used as a recreational area: people walk and bike on the Lamoille Valley rail trail, boat on Lake Memphremagog, and snowmobile on the VAST

11

snowmobile trail that crosses Cousens Lane. According to Ms. Rublee, her guests are generally quiet and respectful, and are simply interested in using the area to recreate. We therefore conclude that Ms. Rublee's small-scale bed and breakfast is not substantially different than other uses in the area, and will suit the existing character of the Shoreland District.

Because we find that Ms. Rublee's bed and breakfast is consistent with the stated purpose of the Shoreland District and that it will complement the existing uses in the area, we answer Question 3 by concluding that Ms. Rublee's proposed bed and breakfast will not have an undue adverse effect on the character of the area.

II.    Traffic (Question 4)

The next issue is whether Ms. Rublee's bed and breakfast will have an undue adverse effect on traffic on roads and highways in the vicinity. See Bylaws § 208.4(C). The roads leading to White Birch Lane are all large enough that the additional traffic from a two-room bed and breakfast will have little to no impact on them. White Birch Lane is a narrow dirt road. It is not wide enough for two cars to pass, but, on the rare instances when two cars do meet head on, one is able to pull over to allow the other to pass. This system has worked in the past on White Birch Lane and on the nearby Cousins Lane, which is the same width and which has significantly more traffic. The Court therefore concludes that the bed and breakfast will not have an adverse impact on traffic safety on White Birch Lane or the surrounding roads.

With regard to road maintenance, White Birch Lane is in good condition for the first hundred feet, but there is a longstanding erosion issue on the inclined portion of the road. The cause of this problem is that the road lacks a crown in this portion, which causes water to concentrate and erode the roadway. Ms. Rublee's expert found, however, that a two-room bed and breakfast would have negligible impact on this underlying problem, and the Court finds this assessment credible. We therefore conclude that, Ms. Rublee's bed and breakfast will not have an undue adverse effect on area roads, thus answering Question 4.[6]

_____

[6] Ms. Rublee testified at trial that she is willing to work with her neighbors to fund road improvements, but that she does not think it is fair to have the road improvements connected to this application, since the road issues are longstanding and the bed and breakfast will have a negligible impact on the road. The Court agrees that it would be unfair to require Ms. Rublee to remedy the preexisting road problems as a condition of this approval when the bed and breakfast did not cause and will not exacerbate the poor road conditions.

III.    Public Health, Safety, and Welfare (Question 5)

The final issue is whether the proposed bed and breakfast will have an undue adverse effect on the public health, safety, and welfare.  See Bylaws § 208.4(F).  Ms. Rublee testified that her experiences with guests have all been positive, that her guests are generally quiet and respectful, and that she is responsible for ensuring safety while guests are staying in her home. She has also taken the necessary steps to ensure fire and food safety at her property.  There was no other evidence or offer that the bed and breakfast would have an undue adverse effect on the public health, safety, and welfare.  We therefore conclude that her project satisfies this criterion, thus answering Question 5.

## Conclusion

The Court concludes that Ms. Rublee's application for conditional use approval for a two-bedroom bed and breakfast at her property on 246 White Birch Lane will not have an undue adverse effect on the character of the area; traffic; or the public health, safety, and welfare.  We therefore conclude that Ms. Rublee's application satisfies the conditional use standards at issue in this appeal, thus answering Questions 2 - 5, and we **GRANT** Ms. Rublee's application for conditional use approval.

A judgment order accompanies this merits decision.  This concludes the matter before the Court.


Electronically signed on August 23, 2016 at 10:41 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division

13