2014 VT 19

### In re Champlain Oil Company Conditional Use Application

[93 A.3d 139]

No. 12-405

Present: **Reiber, C.J., Skoglund, J., and Zonay, Supr. J. and Burgess, J. (Ret.), Specially Assigned**

Opinion Filed February 21, 2014

---

*James A. Dumont*, Bristol, for Appellants.

*Liam L. Murphy* and *Damien J. Leonard* of *Murphy Sullivan Kronk*, Burlington, for Appellee.

¶ 1. **Skoglund, J.** Twelve individuals and the Ferrisburgh Friends of Responsible Growth, Inc. appeal from the Environmental Division's affirmance of the granting of a conditional use zoning permit to Champlain Oil Company. The permit allows applicant Champlain Oil, appellee here, to construct and operate a gasoline and diesel station with a retail convenience store and a

drive-through food facility, including parking lot and overhead canopies for the gas and diesel pumps. Appellants argue that the proposed uses for a convenience, retail and drive-in facility are explicitly prohibited by the Ferrisburgh zoning ordinance and will not be consistent with the town plan. Other issues on appeal will be discussed in the course of this decision. We affirm.

¶ 2. ■ Our review of the environmental court's findings of fact and the conclusions underlying its decision is deferential. *In re Route 103 Quarry*, 2008 VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694. We will not disturb its factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous. *In re Shantee Point, Inc.*, 174 Vt. 248, 263, 811 A.2d 1243, 1255 (2002). We will uphold the court's conclusions as long as they are reasonably supported by the findings. *In re Miller Subdivision Final Plan*, 2008 VT 74, ¶ 13, 184 Vt. 188, 955 A.2d 1200. We are guided in our decision by the fact that land use regulations are in derogation of private property rights and must be construed narrowly in favor of the landowner. *In re Toor*, 2012 VT 63, ¶ 9, 192 Vt. 259, 59 A.3d 722; *In re Weeks*, 167 Vt. 551, 555, 712 A.2d 907, 910 (1998).

¶ 3. The proposed project site is on a parcel of land along Route 7, approximately one half-mile south of the Ferrisburgh town center. The site will cover approximately 9.7 acres after certain land sale transactions are completed as required.[1] The project will be located in two zoning districts: the Highway Commercial District (HC District) and the Rural Agricultural District (RA District).[2] As proposed, the site will have in excess of 1153 feet of frontage on state highway Route 7, described by the court as a major north/south corridor in the Champlain Valley for commercial, industrial, retail, and residential travel. The court noted that the commercial district is host to many commercial developments, such as a motel, a marine supply store, a motorsports store, a gas station and convenience store and a "Dock Doctors" enterprise. The court found that, while the area contained some private

---

[1] While initially there were challenges to the lot mergers and lot-line adjustments contemplated, appellants agreed both to voluntarily dismiss an appeal of the boundary-line adjustment approval by the Ferrisburgh Planning Commission and that the Commission's approval could be admitted as evidence in support of applicant's conditional use approval application.

[2] A small portion of the project site is located in the RA District; however, no development is proposed for that portion of the lot.

residences, the area presented as more commercial in character. It further found that the building area of the project, if developed, would not exceed the physical space encompassed by several of the nearby commercial properties.

¶ 4. We first address appellants' claim that the project and its proposed uses fail to conform to the development standards discussed in the Ferrisburgh Town Plan and that the court erred in deciding that the town plan was aspirational and not intended to be regulatory. Section 1.1.(C) of the town plan, titled "Interpreting the Plan," contains the following: "Goals are long-range aspirations that serve as a broad planning and development guide. A goal describes the end condition that is sought." Appellants' claim of error is directed to § 4.3 of the town plan, which focuses on land use areas and policies. That section begins by stating that "Ferrisburgh's land use plan is intended to guide future growth and development, and protect the town's unique resources." Section 4.3.(G) discusses commercial highway areas, including the area of the proposed project south of the town center. That section states that "[a]ll uses in this area should be conditional, and include only small-scale commercial enterprises and mixed uses typical of a 19th century highway crossroads area."

¶ 5. ■ ■ The environmental court concluded that the purpose provisions of the town plan consisted of aspirational language and that it did not impose a regulatory restriction. We find no error in this reasoning.[3] While the appellants emphasize the concept of a typical nineteenth century highway crossroads area, the fact is that the section merely suggests that uses in the HC District "should" include only small-scale commercial enterprises, not that they must. And, as the court wrote: "[w]e have difficulty interpreting this portion of the Town Plan [as creating a regulatory restriction], since it appears to conflict with the development that the Town has already allowed to occur in the Commercial Highway Areas." We agree with the court that the town plan is designed to guide applicants and decisionmakers on a project's general characteristics but does not establish regulatory standards

---

[3] We note that in a contemporaneous decision, *In re Group Five Investments CU Permit*, the appellants similarly argued that provisions of the Ferrisburgh Town Plan created enforceable standards that precluded grant of a permit. As we do here, this Court held that the general goals were not legally enforceable standards. *In re Grp. Five Invs.*, 2014 VT 14, ¶ 16, 195 Vt. 625, 93 A.3d 111.

with which to judge the proposed project. *In re JAM Golf, LLC,* 2008 VT 110, ¶ 13, 185 Vt. 201, 969 A.2d 47 ("Zoning ordinances must 'specify sufficient conditions and safeguards' to guide applicants and decisionmakers. We will not uphold a statute that 'fail[s] to provide adequate guidance.' " (quoting *Town of Westford v. Kilburn,* 131 Vt. 120, 122, 125, 300 A.2d 523, 525, 526 (1973))). This is precisely how the town plan says it should be interpreted.

¶ 6. We next address appellants' claim that the proposed convenience store and restaurant drive-up service window are not permitted by the town's zoning ordinances. Section 3.5 of Article III of the zoning ordinances states: "any use not expressly permitted in a district is prohibited in that district." For each zoning district the zoning ordinance sets forth a list of uses that are permitted as of right or as conditional uses. Several uses are listed as permitted in the HC District as conditional uses, including gas stations, carwashes, churches, freight or trucking terminals, restaurants, bars and retail stores. However, appellants point to the failure of the HC District description to specifically list "convenience, retail," "retail sales," "drive-in facility" and "accessory use" as permitted uses.[4] They derive the titles of these uses from Article II of the zoning bylaws, a definitional section. So, they argue, while the list of permitted uses for the HC District contains "retail store," neither "convenience, retail" nor "retail sales" are included as permitted uses.[5]

---

[4] In *Group Five,* the appellants similarly argued that a proposed Dollar General store was a "convenience, retail" store not permitted under the zoning bylaws. This Court upheld the environmental court's finding that the store was a permitted use under "retail sales." 2014 VT 14, ¶ 24.

[5] The zoning bylaws contain the following definitions:

Retail Store: Any enclosed business concerned primarily with rental or the sale of produce, products, goods, equipment or commodities; and excluding any drive-in facility, road side agricultural stand, gasoline or motor vehicle service station, motor vehicle sales facility, restaurant or junk yard.

. . . .

Convenience, Retail: Shall mean an establishment whose principal use is the sale of products in small quantities for the daily use of customers including, but not limited to, bakeries, food stores, news stands, tobacco shops, card shops, liquor stores, delicatessens, musical supply stores, pet stores, jewelry stores, camera and photography supplies, ice cream parlors, meat and seafood shops and florist shops.

¶ 7. ██ ██ The grammatical construction of the definitions in the zoning bylaws suggests that they were drafted and added to the definitional section at different times. That being said, zoning bylaws are interpreted according to the general rules of statutory construction. *In re Casella Waste Mgmt., Inc.*, 2003 VT 49, ¶ 6, 175 Vt. 335, 830 A.2d 60 (citing *In re Weeks*, 167 Vt. at 554, 712 A.2d at 909). "We adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." *In re Lashins*, 174 Vt. 467, 469, 807 A.2d 420, 423 (2002) (mem.) (quotation and citation omitted). Nothing in the bylaws suggests that the definitions were intended to proscribe the scope of the permitted uses in a particular zoning district. Further, § 4.4, which governs the HC District, includes the following in the list of conditional uses: "[o]ther similar uses which meet intent of purpose statement upon finding by the Zoning Board that such use is of the same general character as those permitted." We agree with the court below when it found that "a 'convenience retail' store appears to be merely one type of 'retail store' " and was a conditional use in the HC District.

¶ 8. This is not to say that the examples provided in the definitions are not important to the consideration of permitted uses. The fact that the bylaws definition of "retail store" specifically excludes any drive-in facility cannot be ignored. The zoning board of adjustment (ZBA) approval for the project included a separate condition prohibiting the use of a " 'drive-thru' component" to the proposed restaurant but authorizing a " 'drive-in' component." The environmental court noted that it was conducting an evidentiary hearing "anew" and its "legal analysis . . . without regard to the conditions that the ZBA imposed and that Applicant has appealed."

¶ 9. The court found that the proposed restaurant would have "a drive-up service window accessed by a drive-through lane," which it described as "a typical 'drive-through' at a fast-food restaurant, where customers remain in their vehicles and review a menu-

----

. . . .

Retail Sales: Shall mean an establishment whose principal use is the sale of products for consumption or use by the customer off the premises. This shall include but not be limited to hardware, paint, office equipment, sporting goods, trading stamp and redemption outlets, televisions, satellite dishes, automotive supply and major household appliance stores.

board at the rear of the building before ordering through a microphone. They then proceed to the drive-up service window where they stop, pay for the order, and receive their food." It then decided that "a drive-in facility is a valid component to a permissible restaurant" and noted that "[t]here is no indication that the drafters intended to prohibit restaurants in the HC District from incorporating a drive-in facility." The court further stated that it did not "comprehend" a distinction between a drive-through and a drive-in restaurant and voided the ZBA condition, thus leaving in place the restaurant's ability to offer a drive-through element.

¶ 10. However, this Court does comprehend a distinction, remembering the days when servers on roller skates brought food to your car, hanging ingenious trays from your car window — ergo, a "drive-in" restaurant. What we cannot discern is why the bylaw definition of a "retail store" specifically excludes "any drive-in facility" and why the ZBA decided to prohibit a "drive-through" and allow a "drive-in" for the project.

¶ 11. At the hearing below, applicant posited that the proposal does not involve a drive-in facility; rather, the project involves a "drive-up service window." The court found this argument unavailing and concluded that the proposal included a "drive-in facility" as defined in the bylaws: "[a]n establishment designed or operated to serve a patron while seated in a motor vehicle parked in an off-street parking space." We will assume the semantic/definitional debate could rage on until such time as Ferrisburgh again revisits its bylaws to eliminate any confusion (perhaps rethinking the inclusion of "trading stamp and redemption outlets" in the definition of "retail sales"). For purposes of this decision, we uphold the environmental court's conclusion that in reading the bylaws as a whole, and applying common sense, a drive-through component of a restaurant is permissible in the HC District See *Lashins*, 174 Vt. at 470, 807 A.2d at 423 (applying a "plain and common sense reading" to zoning ordinance).

¶ 12. Appellants further claim the court erred in failing to address the visibility of existing parking areas and what they describe as the incremental or cumulative shift in the character of the neighborhood. Their assertion has no merit.

¶ 13. As proposed, the project site would have parking for fifty-four vehicles at various locations throughout the project site: eight spaces along the front of the building, facing Route 7; fifteen

spaces behind the building; fourteen spaces to the north of the building; and eleven spaces to the south of the building. There will also be four parking spaces for tractor trailers or large trucks to the south of the diesel pumps. The court found that dispersing the available parking spaces to the different locations on the project site "minimizes the visual impact of the Project parking." It also noted that the project's capacity for parked cars was only slightly greater than the capacity of the site when it formerly hosted a roadhouse restaurant. Finally it found that, while many of the nearby commercial properties may have fewer designated spaces for parked cars, "th[e] other commercial parking areas are as or more visible from Route 7 as the parking spaces on the Project Site."

¶ 14. ■ It appears that the court carefully examined the anticipated visual impact of the project, considered the surrounding development and found no evidence that the project would affect existing or planned community facilities in any distinguishable or incremental way. It concluded that the project's impact on existing or planned community facilities will not be adverse. The court reasoned that the negligible impact of the existing commercial operations upon the character of the area lent support to its conclusion that the proposed project, "similar in nature," would not have an adverse impact upon the character of the area affected. We can find no error in the court's analysis. See *In re Miller*, 170 Vt. 64, 69, 742 A.2d 1219, 1223 (1999) (upholding environmental court's assessment of adverse impact on character of area where not clearly erroneous).

¶ 15. Finally, appellants argue that the court erred in finding that the proposed septic mounds would be composed only of sand and gravel and that the mounds would be outside the set-back zone. They suggest that a septic mound should be considered a "structure" and that the bases of the project mounds will extend up to or within ten feet of the property line, thus violating the fifty foot and twenty-five foot set-back requirements in the HC District.

¶ 16. The project plan for an on-site wastewater treatment system was approved by the Department of Environmental Conservation. The system consists of the following components: wastewater collection in a series of underground precast concrete tanks for initial wastewater collection, a pretreatment system, and a

mounded leach field. Sand and soils are to be brought on site to construct the earthen mound for the leach-field portion of the system. The earthen mound will be constructed on the down-sloping soils existing on the southern portion of the project site. The base or toe of the mounded soils will extend beyond the perimeters of the leach field in a "gentle slope." The court found that "[t]he leach field and sloping soils will be located entirely within the Project Site, with the leach field no closer than 25 feet from any boundary line and the sloping soils of the mound being no closer than 10 feet from any boundary line."

¶ 17. Again turning to the definition section of the Ferrisburgh bylaws, we discover the definition of "structure" to be "[a]n assembly of materials for occupancy or use, including, but not limited to, a building, manufactured home or trailer, billboard, sign, wall or fence, except a wall or fence on an operating farm. Structures do not include sidewalks, driveways, roads or non-commercial parking lots, non opaque fences or fences less than four (4) feet in height."

¶ 18. ■ Appellants posit that the proposed mounds are structures under the reasoning of this Court in *In re Laberge Moto-Cross Track*, 2011 VT 1, 189 Vt. 578, 15 A.3d 590 (mem.). The regulations at issue there defined a structure as "anything constructed, erected, or placed and which requires a fixed location on the ground in order to be used," such as a mobile home or a tennis court. *Id.* ¶ 10. Appellants' argument hinges on the fact that in *Laberge* there was no additional excavation and no materials were introduced to the site from elsewhere whereas, in this case, the materials for the mound system will be imported to the site and the mound system will be as permanent as a house.[6] However, in *Laberge* we concluded that the moto-cross track did not require a zoning permit as it was a de minimis incidental use of property and was not the type of structure contemplated by the town's zoning ordinance. *Id.* ¶¶ 7, 11. Appellants can find no support in that decision for their strained vision of a "structure."

¶ 19. ■ The mound to be created is part of a wastewater system. While the court did not specifically address the challenge to the toe mounted by appellants, it found that the leach field

---

[6] Appellants also point out that the regulation in *Laberge* excluded all fences while the Ferrisburgh definition includes fences. The apparent significance of this distinction is lost on this Court.

itself would be no closer than twenty-five feet from the side-yard setback minimum established for the HC District. It also found that the wastewater system was to be located at or below the finished grade of the site. We will defer to the environmental court's treatment of the sloping toe as a visual element of a wastewater system, necessary to bring the system to the finished grade of the site. See *In re Eastview at Middlebury, Inc.*, 2009 VT 98, ¶ 10, 187 Vt. 208, 992 A.2d 1014 ("Because the Environmental Court determines the credibility of witnesses and weighs the persuasive effect of evidence, we will not overturn its factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." (quotation omitted)); *In re Bennington Sch., Inc.*, 2004 VT 6, ¶ 11, 176 Vt. 584, 845 A.2d 332 (mem.) ("The environmental court's findings of fact will be upheld if based on relevant, admissible evidence that a reasonable person would consider as supporting the conclusion."). Further, what appellants suggest would require that the merest lip of earth designed to integrate a septic mound into the surface of the land would be required to comply with set-back lines. See *Laberge*, 2011 VT 1, ¶ 8 (reiterating court's role in interpreting zoning ordinance is to give effect to legislative intent and "apply common sense" (quotation omitted)). The environmental court's interpretation of the setback provisions is sound, and we agree with the approach taken.

*Affirmed.*