NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 112

No. 2017-071

| | |
|---|---|
| In re Confluence Behavioral Health, LLC Conditional Use to Operate a Therapeutic Community Residence Program (Jason Albert, et al., Appellants) | Supreme Court<br><br>On Appeal from Superior Court, Environmental Division<br><br>September Term, 2017 |

Thomas S. Durkin, J.

Ronald A. Shems and Abaigeal C. O'Brien, Law Clerk (On the Brief) of Diamond & Robinson, P.C., Montpelier, for Appellants.

Nathan H. Stearns of Hershenson Carter Scott & McGee, P.C., Norwich, for Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1.     **EATON, J.**   The Environmental Division approved the issuance of a conditional-use permit for Confluence Behavioral Health, LLC's proposed community therapeutic residence in Thetford. A group of neighbors appeal the decision. Neighbors contend that the Environmental Division improperly concluded that Confluence's therapeutic community residence (the Project) was a health care facility, and thus was an allowed conditional use under the Thetford zoning ordinance. Neighbors also assert that the Project's residential use requires separate permitting and that it impermissibly establishes a nonconforming use. We affirm.

¶ 2.     On January 19, 2016, Confluence Behavioral Health, LLC received conditional-use and site-plan approval from the Thetford Development Review Board (DRB) to operate a

therapeutic community residence on Gove Hill Road in Thetford, Vermont. The property is approximately 125 acres, largely consisting of open, wooded areas, and is located in Thetford's Rural Residential zoning district. Under Article II, Section 2.01 of the Thetford Zoning Bylaws, the Rural Residential district is intended to "maintain an area of low average density that is compatible with clusters of high-density, remaining primarily a district of open space, farms, residences, and woodlands, with scattered commercial uses that are either home-based or dependent on natural resources." Under the Bylaws, health care facilities are allowed as conditional uses in Thetford's Rural Residential areas. However, the term "health care facility" is not defined in the zoning ordinance, setting the stage for the issue at hand.

¶ 3. The Gove Hill Road property includes several existing structures, all of which were used by the property's former owners, the American Baptist Churches of Vermont and New Hampshire. The Church used the property year-round (between 250 and 275 days per year) to host therapeutic retreats, conferences, and events for various church-related and secular groups, recovery programs and mental-health retreats, older teen camping trips, horseback riding camps, and summer camps for inner city youth. Retreats hosted up to sixty participants plus operational staff.

¶ 4. Confluence plans to house its new Project on the Gove Hill Road property. The Project, licensed by the Vermont Department of Disabilities, Aging and Independent Living (DAIL), is a short-term wilderness therapy program designed to treat young adult males (ages eighteen to twenty-eight years old). The program combines clinical therapeutic services with adventure-based wilderness therapy and agrarian living to help clients address mental-health diagnoses, as well as emotional, behavioral, and relational challenges. The treatment is interdisciplinary and supported by a team of professional providers. A Vermont licensed mental-health therapist oversees the therapeutic program and acts as the bridge between the experiential

2

components and deeper clinical work. Individual, group, family, and experiential therapy sessions are interspersed throughout each week.

¶ 5. The Project involves an inpatient treatment component that takes place on-site. All therapy sessions with licensed practitioners will occur on the property; patients will live in together in groups and participate in the responsibilities of communal, agrarian living; and, while treatment will occur both on and off the property site, patients will reside on the property under Confluence's care for an average of nine to twelve weeks. The minimum stay in the program will be eight weeks. Confluence anticipates hosting up to forty-eight patients and thirty-seven staff to stay on the property at any one time to participate in the program. Based on the Project description and facts surrounding property use outlined above, the Development Review Board (DRB) issued the conditional-use and site-plan approval in dispute here.

¶ 6. In its Conditional Use Review Findings and Decision, the DRB approved Confluence's Project as a "health care facility" pursuant to Table 2.1 of the Zoning Bylaws. The DRB explained: "Under 6.06 of the Zoning Bylaws, all Conditional Use applications . . . are subject to Site Plan review procedures, criteria, and standards and are automatically incorporated here, in a single conditional use review." In its review, the DRB evaluated the Project for compliance with multiple sections of the Thetford Zoning Bylaws—vehicular circulation and parking; landscaping, building design, and lighting; noise, odors, smoke, dust, noxious gases, and air pollution; fire and public safety; waste and underground utilities; and compliance with Thetford's Rural Residential district standards and the "character of the area." The DRB found that that the "intensity of the proposed use is consistent with, and possibly less intensive than, the intensity of the previous use of the property as a center for therapeutic retreats," and that the "[P]roject complies with all Town ordinances, bylaws and regulations currently in effect." Regarding the Rural Residential district restrictions, the DRB determined: "The [P]roject is in compliance with standards addressing the impact of the use on the community at large, adjacent

3

properties, and the neighborhood and zoning district . . . the proposed [P]roject will maintain the existing low-density development of the property consistent with the historic use of the property and the character of the area . . . the proposed use will not have an undue adverse effect on the character of the area." Subject to several conditions—such as prohibiting Confluence from accepting applicants with violent or sexual criminal histories, restricting the use of electronic amplification and outdoor fires, and limiting project modifications and expansions—the DRB approved the Project.

¶ 7. A group of Project neighbors appealed the DRB's decision to the Environmental Division. Neighbors and Confluence filed cross motions for summary judgment, primarily disputing whether the Project was properly permitted as a "health care facility" for the purposes of the Bylaws, or whether the Project is a residential facility that should not be allowed in Thetford's Rural Residential district. Neighbors also claimed that the Project impermissibly reestablished the Church's abandoned nonconforming use of the property for events and retreats. In July 2016, the parties stipulated that the Church's nonconforming use had been abandoned and that Confluence could not receive a permit on the basis that it may continue a nonconforming use.

¶ 8. On January 23, 2017, the Environmental Division issued its decision that the Project was a "health care facility." In doing so, the Environmental Division relied on its interpretation of the Zoning Bylaws, permitting of the project by DAIL, and extrinsic sources defining and applying "health care facility" in various contexts. The Environmental Division also determined that any ambiguity should be resolved in favor of allowing the Project. Neighbors appealed.

¶ 9. On appeal, neighbors contend that the proposed use is not a "health care facility" and that it is more akin to a community residence or group living facility—residential uses not allowed in Thetford's Rural Residential district. Additionally, neighbors argue: (1) even if the

4

Project is a "health care facility," its additional use as a residential facility is precluded under the Bylaws; and (2) the Project is a reestablished, nonconforming use and must be prohibited.

¶ 10. The parties disagree about the level of deference this Court should give to the Environmental Division's interpretation of the Town's zoning ordinance. Neighbors contend that the interpretation of a zoning ordinance presents a legal issue that we review de novo without deference to the Environmental Division. In contrast, Confluence asserts that the deference we have historically given to the Environmental Division with respect to findings of fact extends to its interpretation of zoning ordinances.

¶ 11. The uncertainty as to our standard of review arises from our own arguably inconsistent statements on the subject. On many occasions, including recently, we have stated that we will "uphold the decision on the construction of a zoning ordinance unless it is 'clearly erroneous, arbitrary or capricious.' " In re Willowell Found. Conditional Use Certificate of Occupancy, 2016 VT 12, ¶ 13, 201 Vt. 242, 140 A.3d 179; see also, e.g., In re Wagner & Guay Permit, 2016 VT 96, ¶ 12, ___ Vt. ___, 153 A.3d ("[W]e must accord deference to the environmental court's construction of a permit condition, particularly when the court's expertise will assure consistent interpretation of the law." (quotation omitted)); In re Group Five Inves. CU Permit, 2014 VT 14, ¶ 4, 195 Vt. 625, 93 A.3d 111 ("We uphold the environmental court's interpretation of a zoning regulation so long as it is rationally derived from a correct interpretation of the law and not clearly erroneous, arbitrary or capricious."); In re Champlain Coll. Maple St. Dormitory, 2009 VT 55, ¶ 13, 186 Vt. 313, 980 A.2d 273 ("On review, we will uphold the Environmental Court's construction of an ordinance unless it is clearly erroneous, arbitrary or capricious." (quotation omitted)).

¶ 12. Recently, however, we have stated that we review the Environmental Division's interpretation of a regional plan, which we expressly analogized to its interpretation of a zoning ordinance, "without deference to the trial court" because "it presents a legal issue." In re B & M

5

Realty, LLC, 2016 VT 114, ¶ 31, ___ Vt. ___, 158 A.3d 754.  In a lengthy footnote, we explained that because the Environmental Division is part of the judicial branch, "there is no separation-of-powers imperative for deferential review."  Id. ¶ 31, n.2. (quotation omitted).  For that reason, we indicated that:

> [W]here the outcome of the matter turns not on findings of fact, but on interpretation of a statutory term, and where we are not reviewing a decision by an agency charged with promulgating and interpreting its own rules, we employ the familiar de novo standard of review for matters of law.

Id. (quotation omitted).  We did not, however, expressly disavow or overrule our repeated prior statements, noted above, that we review the Environmental Division's interpretation of a permit condition or zoning ordinance deferentially.  We do so now, overruling prior cases which afforded deference to the Environmental Division's interpretation of a permit condition or a local zoning ordinance.  Henceforth, we will review the Environmental Division's interpretation of permit conditions and local zoning ordinances without deference.[1]

¶ 13.   The caselaw and rationale we relied upon in establishing this exception to the general rule that we review legal questions without deference do not actually support the maxim that we should uphold the Environmental Division's interpretation of a zoning ordinance or permit condition unless it is "clearly erroneous, arbitrary, or capricious."  This oft-repeated statement can be traced back to Application of McDonald's Corp., 151 Vt. 346, 349, 560 A.2d 362, 364 (1989). Two points are significant regarding our use of the statement in that case.  First, we were construing a decision of the superior court a year before the specialized environmental court was

---

[1] Decisions recognizing the deference afforded to municipalities in interpreting their own ordinances and to agencies in interpreting their own rules, including those made by the prior Environmental Board, are not affected by the rule announced herein.  Similarly, we continue to afford deference to the Environmental Division, as we do with other Superior Court divisions, on factual findings.

created. Therefore, the standard of review we invoked was not based upon any particular expertise of the trial court with respect to zoning law.

¶ 14. Second, in support of the stated standard of review, we cited Brassard Bros. v. Barre Town Zoning Bd. of Adjustment, 128 Vt. 416, 264 A.2d 814 (1970), and DeWitt v. Town of Brattleboro Zoning Bd. of Adjustment, 128 Vt. 313, 262 A.2d 472 (1970), using a "cf." signal.[2] In Brassard Bros., we reversed the superior court's order vacating a decision of a local board of adjustment, stating that "courts should not interfere with the administrative action of the zoning board unless the denial of the variance is shown to be clearly unreasonable, arbitrary or capricious." 128 Vt. at 421, 264 A.2d at 817. Similarly, in Dewitt, we stated that "[c]ourts will not interfere with zoning or administrative action concerning special uses, variances, exceptions or nonconforming uses unless clearly unreasonable, irrational, arbitrary or discriminatory." 128 Vt. at 319, 262 A.2d at 476. Thus, the foundation for the "clearly erroneous, arbitrary or capricious" standard for reviewing the Environmental Division's construction of a zoning ordinance appears to be nothing more than the unremarkable proposition that we "defer to a municipality's interpretation of its own zoning ordinance and will uphold it if it is reasonable and has been applied consistently." In re Carrigan Conditional Use & Certificate of Compliance, 2014 VT 125, ¶ 10, 198 Vt. 438, 117 A.3d 788.

¶ 15. Our deference to consistently applied municipal decisions stems in large part from separation-of-powers concerns. As we explained in In re Albert, "[w]e defer to agency interpretations of statutes that the Legislature has entrusted them to administer as much out of a concern for the proper separation of powers as in consideration of agency expertise." 2008 VT 30, ¶ 6, 183 Vt. 637, 954 A.2d 1281 (mem.); see also Town of Victory v. State, 2004 VT 110,

---

[2] "Cf." preceding a citation signals that "the cited authority supports a proposition different from the main proposition but sufficiently analogous to lend support. Literally, 'cf.' means 'compare.'" The Bluebook: A Uniform System of Citation 59 (Colum. L. Rev. Ass'n et al. eds., 20th ed. 2015).

¶ 16, 177 Vt. 383, 865 A.2d 373 ("To preserve the appropriate separation of judicial and executive powers, we presume that judicial review of administrative decisions is deferential unless there is a clear [legislative] statement of contrary intent."). But because the Environmental Division "is a part of the judicial branch, there is no separation of powers imperative for judicial review" of its decisions. Albert, 2008 VT 30, ¶ 6; see also In re SP Land Co., LLC, 2011 VT 104, ¶ 13 n.2, 190 Vt. 418, 35 A.3d 1007 (stating separation-of-powers concerns did not require giving deference to environmental court's interpretation of Act 250 Rule 34(D) where we were not "dealing with an agency's interpretations of its own rules" but rather were "reviewing a decision from a part of the judicial branch").

¶ 16. To the extent that we have suggested other reasons for deferring to the Environmental Division's construction of zoning ordinances or permit conditions, those considerations likewise do not warrant a special rule of deference to the trial court with respect to interpretation of zoning ordinances and permit conditions. For example, in Agency of Natural Resources v. Weston, we held that the environmental court's construction of an Act 250 permit condition is due deference, "particularly when the court's expertise will assure consistent interpretations of law." 2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.). Weston, in turn, relied on language from an earlier case in which this Court afforded deference to the environmental court's interpretation of an Act 250 permit provision. See id. (citing Sec'y, Vt. Agency of Nat. Res. v. Handy Family Enters., 163 Vt. 476, 482, 660 A.2d 309, 313 (1995)). In Handy, we stated that we must accord "some deference" to the environmental court's determination as to whether a permit condition is vague because "[s]uch conclusions necessarily involve mixed questions of fact and law" and because "[t]he division was created to place all environmental enforcement actions, and the appeal of certain environmental orders, before one judge" to assure "more even-handed enforcement of environmental laws." Handy, 163 Vt. at 482, 660 A.2d at 313 (quotation omitted). We have recently emphasized, however, in the context of zoning matters, that "[w]e

8

review mixed questions of law and fact de novo." In re Lathrop Ltd. P'ship, 2015 VT 49, ¶ 44, 199 Vt. 19, 121 A.3d 630; see also Luck Bros., Inc. v. Agency of Transp., 2014 VT 59, ¶ 26, 196 Vt. 584, 99 A.3d 997 (stating that our review of mixed questions of law and fact is nondeferential and on the record). Moreover, we no longer have a separate environmental court with a single environmental judge, but rather an Environmental Division with multiple judges within a unified system.

¶ 17. In sum, we review zoning ordinances and municipal permit conditions according to the principles of statutory construction. Wagner & Guay, 2016 VT 96, ¶ 11. We approach the interpretation of such ordinances and permits as a legal question that we resolve without deference to the trial court. See In re Treetop Dev. Co. Act 250 Dev., 2016 VT 20, ¶ 9, ___ Vt. ___, 143 A.3d 1086 (stating that this Court proceeds "with a nondeferential, on-the-record review" of issues of law and statutory interpretation); see also In re Jenness & Berrie, 2008 VT 117, ¶ 26, 185 Vt. 16, 968 A.2d 316 ("To the extent that the setback issues raises questions of law, our review is de novo."). To the extent that we have suggested otherwise in prior decisions, we overrule those statements. Thus, we review the Environmental Division's determinations regarding Confluence's Project de novo.

¶ 18. There is no factual dispute in this case; both parties agree on the scope of the Confluence Project. The question is whether Confluence's community therapeutic residence qualifies as a "health care facility" under the Thetford Zoning Bylaws. We conclude that it does.

¶ 19. Zoning bylaws are enacted to implement a town plan. 24 V.S.A. § 4411(a) ("A municipality may regulate land development in conformance with its adopted municipal plan . . . ."). "Although the plan may recommend many desirable approaches to municipal development, only those provisions incorporated in the bylaws are legally enforceable." Kalakowski v. John A. Russel Corp., 137 Vt. 219, 225-26, 401 A.2d 906, 910 (1979). To determine whether a project complies with the bylaws, familiar rules of construction can be used.

9

In re Howard Cent. Renovation Permit, 2014 VT 60, ¶ 9, 196 Vt. 542, 99 A.3d 1013.  Thus, interpreting municipal zoning ordinances requires examining the language and intent of the Bylaws and the drafters.[3]

¶ 20.    Our goal in interpreting a zoning ordinance is to give effect to the legislative intent. In re Howard Cent. Renovation Permit, 2014 VT 60, ¶ 9 ("[The] paramount goal in construing a zoning ordinance, like any statute, is to give effect to the legislative intent."(quotation omitted)). To this end, the Court "construe[s] an ordinance's words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance."  In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578, 15 A.3d 590 (mem.) (quotation omitted).  We are "bound by the plain meaning of the words . . . unless the express language leads to an irrational result."  In re Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 6, 190 Vt. 132, 27 A.3d 1071 (quotation omitted). If there is no plain meaning apparent, the Court attempts to discern the intent from other sources. In re Stowe Club Highlands, 164 Vt. 272, 280, 668 A.2d 1271, 1277 (1995).

¶ 21.    Here, the Thetford Zoning Bylaws neither expressly permit nor prohibit "therapeutic community residences."  Table 2.1 of the Thetford Zoning Bylaws contains a list of

---

[3]  Neighbors encourage this Court to apply the "actual use" test, which we use to assess Act 250 jurisdiction, rather than tools of statutory construction to determine whether the Project conforms to the Thetford Zoning Bylaws as a "health care facility."  Act 250 analysis and municipal zoning interpretation serve different purposes—Act 250 considers actual use of the land rather than the overall purpose of a development scheme to ensure accountable land development, while zoning ordinances are enacted to provide for development that is consistent with a town or municipal plan.  See In re S-S Corp./Rooney Hous., Dev., 2006 VT 8, ¶ 12, 179 Vt. 302, 896 A.2d 67 ("Act 250 was enacted 'to protect and conserve the lands and the environment of the state and to ensure that these lands and environment are devoted to uses which are not detrimental to the public welfare and interests.' ").  As such, Act 250 cases are inherently use-based.  In re BHL Corp., 161 Vt. 487, 490, 641 A.2d 771, 773 (1994) ("[T]he proper starting point for determining Act 250 jurisdiction is the actual use of the land, not necessarily the overall purpose of a development scheme.").  Here, we address the issue of interpreting a zoning ordinance, which this Court has consistently analyzed under traditional methods of statutory construction. See Wagner & Guay, 2016 VT 96, ¶ 11 (declining to construe permit conditions based "under the same principles as private contracts" because "permit conditions are construed according to normal rules of statutory construction").  Thus, the actual use test is inapplicable.

permitted uses by district. While "therapeutic community residence" is not listed as a permitted or conditional use in any district, Table 2.1 includes "health care facility" as an allowed conditional use in the Town's Rural Residential area. Thus, if Confluence's therapeutic community residence is a "health care facility," then it may be allowed as a conditional use and we need not investigate further. Because the Bylaws do not define the term "health care facility," we are tasked with determining its meaning.

¶ 22. We begin our examination of the Bylaws' language by looking to the zoning district's purpose. See In re Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 13 (discussing the importance of reviewing purpose of underlying zoning district when construing zoning ordinance language). The Bylaws state that the purpose of Thetford's Rural Residential district is:

> [T]o maintain an area of low average density that is compatible with clusters of high-density, remaining primarily a district of open space, farms, residences and woodlands, with scattered commercial uses that are either home-based or dependent on natural resources. This area is characterized by development that has [p]articular sensitivity to agriculture and natural resources[, and] [m]inimal sprawl . . . .

¶ 23. There is some development that by its nature would necessarily be incompatible with the stated purpose of the Rural Residential district. However, a therapeutic residential facility is not, simply because it is therapeutic and residential, in conflict with the stated purpose of the Rural Residential area—to safeguard natural resources and ensure minimal development. It is entirely possible for a therapeutic residential facility to be located within the Rural Residential district without disrupting the district's stated purpose. Considering the purpose of the Rural Residential district does not lead us to the conclusion that a therapeutic community residence cannot be a health care facility.

¶ 24. Neighbors argue that the Project is a "therapeutic community residence," and, consequently, cannot be a "health care facility." However, simply because a particular use, or an aspect of a use, is not expressly listed as permitted in the Bylaws does not mean that use is

11

prohibited. See In re LaBerge Moto-Cross Track, 2011 VT 1, ¶ 14 (finding restrictive clause expressly prohibiting specific use was not dispositive in determining whether use was permittable due to "breadth of novel land-development possibilities a municipal body may face"). Moreover, there is no reason to conclude that the Project's use as a "therapeutic community residence" and its use as a "health care facility" are mutually exclusive; a "therapeutic community residence" can be a subcategory of "health care facility."[4] The Project provides professional mental-health counseling and treatment through on-site, inpatient programs—services commonly associated with "health care facilities." Therefore, the purpose and plain language of the Thetford Zoning Bylaws provide support for the contention that Confluence's Project is a "health care facility" and allowed as a conditional use.

¶ 25. This Court may also look to sources outside the Bylaws when interpreting a zoning ordinance. In re Stowe Club Highlands, 164 Vt. at 280, 668 A.2d at 1277; see also Pease v. Windsor Dev. & Review Bd., 2011 VT 103, ¶ 17, 190 Vt. 639, 35 A.3d 1019 (looking to dictionary definitions to support statutory interpretation). Here, Confluence's Project comports with common definitions of "health care facility," Vermont statutory provisions employing that term, DAIL licensing regulations, caselaw, and the Thetford Town Plan—all of which are nonbinding, but persuasive, in our analysis.

¶ 26. "Health care facility" includes: "the prevention, treatment, and management of illness and the preservation of well-being through services offered by the medical and allied health professions," Health care American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=health+care [https://perma.cc/VG4B-QLUJ], and "efforts made to maintain or restore health[,] especially by trained and licensed professionals,"

---

[4] See infra ¶ 30 (explaining that DAIL regulations list "therapeutic community residence" as a subcategory of "health care facility"); ¶ 37 (explaining that conditional-use and site-plan approval for a "health care facility" under the Bylaws is sufficient to cover collateral residential uses—additional permitting is unnecessary).

Health care Merriam-Webster.com, https://www.merriam-webster.com/dictionary/health%20care [https://perma.cc/CB9B-TEVB]. While "health care" may be more strictly defined as care provided by doctors and psychiatrists (e.g., "especially by trained and licensed professionals"; "services offered by the medical profession"), there is no indication that a "health care facility" must be construed so narrowly—facilities offering "trained and licensed professionals" are sufficient.

¶ 27. Confluence's Project meets this broad definition by providing a space for young adult males, all of whom must have a diagnosed mental-health condition, to seek therapeutic attention under clinical supervision. Confluence describes its program as:

> [A] short-term residential wilderness therapy program designed to treat young adult males 18-28 years old. Confluence's program combines clinical therapeutic services with adventure-based wilderness therapy and agrarian living to help clients address mental health diagnosis and emotional, behavioral, and relational challenges . . . . [C]lients will participate in individual and group therapy sessions, counseling and peer support all supervised by a licensed mental health professional . . . . The entire client experience while at Confluence is designed to work together as part of the therapeutic treatment.

(emphases added). As such, the Project fits comfortably within the scope of "health care facility" outlined above.

¶ 28. While not binding, statutory language may aid us in defining "health care facility." See Sec'y, Vt. Agency of Nat. Res. v. Hardy Family Enter., 163 Vt. 476, 483-84, 660 A.2d 309 (1995) (looking to Vermont statute regulating outdoor advertising for definition of the word "sign"). Title 18, Chapter 221, which governs health care administration in Vermont, defines "health care facility" as follows: "[A]ll institutions, whether public or private, proprietary or nonprofit, which offer diagnosis, treatment, inpatient, or ambulatory care to two or more unrelated persons, and the buildings in which those services are offered." 18 V.S.A. § 9402 (emphases added). Title 18, Section 9432(8) similarly defines "health care facility":

13

"Health care facility" means all persons or <u>institutions</u>, including mobile facilities, whether public or private, proprietary or not for profit, which offer diagnosis, <u>treatment</u>, <u>inpatient</u>, or ambulatory <u>care to two or more unrelated persons</u>, and the buildings in which those services are offered. The term . . . shall include but is not limited to:

(A)    hospitals, including general hospitals, mental hospitals, chronic disease facilities, birthing centers, maternity hospitals, and psychiatric facilities including any hospital conducted, maintained, or operated by the state of Vermont, or its subdivisions, or a duly authorized agent thereof;

(B)    nursing homes, health maintenance organizations, home health agencies, outpatient diagnostic or therapy programs, kidney disease treatment centers, mental health agencies or centers, diagnostic imaging facilities, independent diagnostic laboratories, cardiac catheterization laboratories, radiation therapy facilities, or any <u>inpatient</u> or ambulatory surgical, diagnostic, or <u>treatment center</u>.

18 V.S.A. § 9432(8) (emphases added).  The statute specifically defines "health care facility" to include inpatient facilities.  Thus, a health care facility that provides treatment to people who stay on the property, such as Confluence's Project, is encompassed within the definition.  Various state agency regulations contain the same definition.  See Green Mountain Care Board Regulations 80-003, Code of Vt. Rules § 80-280-003, https://www.lexisnexis.com/hottopics/codeofvtrules/; Dept. of Financial Regulations, Division of Health Care Administration 21-020, Code of Vt. Rules § 21-040-020-3, https://www.lexisnexis.com/hottopics/codeofvtrules/; Dept. for Children and Families 130-710, Code of Vt. Rules § 13-170-710-7101.3, https://www.lexisnexis.com/hottopics/codeofvtrules/.

¶ 29.    Confluence's Project aligns with these statutory definitions.  The Project involves the provision of mental-health treatment to two or more unrelated persons to help patients address mental-health diagnoses, as well as emotional, behavioral, and relational challenges.  Confluence will provide mental-health care to patients through individual and group therapy sessions with licensed mental-health professionals, combined with adventure-based wilderness therapy and communal agrarian living, that are clinically designed to work together as part of a therapeutic

14

treatment. Therefore, Vermont statutory definitions support the conclusion that the Project is a "health care facility."

¶ 30.   The fact that DAIL, which is statutorily responsible for licensing and regulating "long-term care facilities in which medical, nursing, or other care is rendered," is licensing Confluence's Project reinforces the argument that the Project is a "health care facility." 33 V.S.A. § 7101; see also 33 V.S.A. § 504(a) (directing DAIL to administer "[a]ll of the duties, responsibilities, and authority of the Division of Licensing and Protection to . . . nursing homes . . . residential care homes, hospitals, and home health services granted under the authority of chapter 71 of this title and any other provision of law"). While definitions provided by DAIL are nonbinding on this Court, they further support the conclusion that the Project is a "health care facility." Certain DAIL facilities are specifically defined to include licensed therapeutic community residences. See 33 V.S.A. § 7102(2). Under these provisions, "facility" means a "therapeutic community residence licensed or required to be licensed pursuant to the provisions of this chapter." Id. Therapeutic community residences are defined as: "place[s], however named, excluding hospitals as defined by statute, which provide[], for profit or otherwise, transitional individualized treatment of three or more residents with major life adjustment problems, such as alcoholism, drug abuse, psychiatric disability, or delinquency." Id. § 7102(11). DAIL's website lists "health care facilities" that DAIL licenses and certifies. Vt. Dep't of Disabilities, Aging & Indep. Living: Div. of Licensing & Prot., http://dlp.vermont.gov/ [https://perma.cc/Z358-4XMC]. "Therapeutic community residence" is one type of facility included in this list. Vt. Dep't of Disabilities, Aging & Indep. Living: Div. of Licensing & Prot., Facility Lists, http://dlp.vermont.gov/survey-cert/facility-lists [https://perma.cc/TH49-9KZK]. Thus, under DAIL's licensing authority, Confluence's therapeutic community residence would be recognized as subcategory of "health care facility" "in which medical, nursing, or other care is rendered"— the two uses are not mutually exclusive as neighbors contend.

15

¶ 31. The Court has not defined "health care facility" in the context of interpreting a zoning ordinance. However, two tax exemption cases, Fletcher Farm, Inc. v. Town of Cavendish, 137 Vt. 582, 409 A.2d 569 (1979), and Kingsland Bay School, Inc. v. Town of Middlebury, 153 Vt. 201, 569 A2d 496 (1999), have considered whether therapeutic community residences were facilities used for "health purposes." Again, while not dispositive, these cases aid our analysis here. In Fletcher Farm Inc. v. Town of Cavendish, we determined that a licensed therapeutic community residence, which included "group therapy, work, recreation, family-style meals and other related programs," established that the property was being used for health purposes, and was therefore not exempt from real property tax under 32 V.S.A. § 3832(7). 137 Vt. at 582, 409 A.2d at 569. The Fletcher Farm, Inc. program included an inpatient component. Id. Alternately, in Kingsland Bay School, Inc. v. Town of Middlebury, property that was used to provide group housing and instruction for adolescents with life adjustment challenges, but was not licensed as a therapeutic community residence and offered no treatment or counseling on the property, qualified for tax exemption due to the lack of on-property treatment. 153 Vt. at 206, 569 A.2d at 499. The Court distinguished Kingsland Bay School, Inc. from Fletcher Farm, Inc. on the basis that, while Fletcher Farm offered inpatient, on-site treatment, "any special physical or mental problems that afflicted Kingsland residents are treated by outside providers; even counseling sessions take place outside the group home." Id. These two cases demonstrate that on-site, inpatient treatment is an important factor in determining whether a therapeutic community residence is a facility used for "health purposes." Similar to the Fletcher Farm, Inc. program, Confluence provides on-site, inpatient treatment; thus, the Project comports with use for "health purposes" under this Court's caselaw.

¶ 32. Neighbors further argue that Confluence's Project is impermissible because the Town Plan suggests that extended care facilities should be allowed in Village Residential and

16

Community Business zones, but not in Rural Residential areas. This Court has addressed the role of a town plan in interpreting zoning regulations:

> [T]he [town] plan is merely an overall guide to community development. It is a general guideline to the legislative body for its consideration of the municipality's land use program and of the community's needs and desires. Often stated in broad, general terms it is abstract and advisory. Zoning bylaws, on the other hand, are specific and regulatory. Zoning is properly conceived of as the partial implementation of a plan of broader scope. It must reflect the plan, but it need not be controlled by it. Although the plan may recommend many desirable approaches to municipal development, only those provisions incorporated in the bylaws are legally enforceable.

Kalakowski, 137 Vt. at 225-26, 401 A.2d at 910 (citation omitted). The town plan serves as a guide to outline community development; however, the plan cannot impose mandatory standards on community actors—that is the purview of the zoning bylaws.

¶ 33. Here, the Town Plan offers guidance on development of the Rural Residential district in its recommended policies, but these recommendations are not mandatory unless these policies were expressly implemented through the Zoning Bylaws. The Town Plan suggests:

> Consider adding specific ordinances: . . . Residential institutions, such as homes for the aged, rest homes, extended care facilities, convalescent homes, elderly housing projects and similar types of living accommodations should be permitted as conditional uses, rather than permitted uses, close to community facilities and services in the village residential and community business zones.

This language is aspirational and not binding on this Court. The language, "consider adding specific ordinances," indicates that this section of the Town Plan was not intended to function as a regulatory requirement without adoption into the Zoning Bylaws, but rather as mere thoughts regarding possible future zoning ordinance amendments. Without such adoptions, aspirational language in the Town Plan is not regulatory. See In re Champlain Oil Co. Conditional Use Application, 2014 VT 19, ¶ 5, 196 Vt. 29, 93 A.3d 139 (finding word "should" provides guidance, but does not establish regulatory standards in town plan). The Town Bylaws recognize this

principle internally by stating: "Recommended policies are actions that, <u>when enacted</u>, will achieve an objective." (emphasis added). As such, language in the Town Plan is not binding.

¶ 34. Additionally, the language in the Town Plan does not expressly refer to health care facilities. Even if the Town Plan evidences an intent that "homes for the aged, rest homes, extended care facilities, convalescent homes, elderly housing projects, and similar types of group living accommodations" should only be allowed close to Village Residential and Community Business zones, these facilities serve a different purpose than Confluence's Project because they provide long-term care, rather than short-term transitional treatment.[5] The Project may still be deemed a "health care facility," which is expressly permitted in Rural Residential areas with a conditional-use permit under the enacted Bylaws, while the aforementioned examples are not. Therefore, even using the Town Plan to lend persuasive authority to our interpretation, there is no reason to narrowly construe the Town Plan to exclude the Project.

¶ 35. In addition to their "actual use" argument, which we have rejected, neighbors contend that, even if the Project is used to some degree as a "health care facility," the Project is primarily residential, and those residential aspects should be considered—if not dispositive—in determining whether Confluence's Project is allowed in Thetford's Rural Residential area. Under

---

[5] The examples listed in the Town Plan's "Recommended Policies" are distinguishable from the Project due to the intended duration and purpose of the patient's stay. These examples, such as convalescent homes and extended care facilities, provide long-term care where residents reside for the purpose of receiving daily care, which need not be for purposes of treatment of a medical condition, without intent to leave. Residents could remain at the facility indefinitely, as if it were permanent home. In contrast, Confluence's therapeutic community residence anticipates a regimen of professional treatment with a set termination date after eight or twelve weeks. DAIL's definition of therapeutic community residence, which explains that such facilities are "transitional" rather than long-term or permanent, further supports this distinction. The Town Plan is concerned with large numbers of people being housed for an open-ended period in the Rural Residential area, yet the Bylaws allow "health care facilities" in the Rural Residential district. These two competing visions can be reconciled by permitting short-term inpatient treatment at "health care facilities" in the Rural Residential area, while relegating long-term care facilities, which may only be providing assistance with activities of daily living, to the more populated Village Residential and Community Business zones.

neighbors' logic, the Project's primary use is residential, trumping its secondary use as a "health care facility," and must undergo the permitting process accordingly. We remain unpersuaded.

¶ 36. Neighbors argue that the impacts of the Project, rather than the definition of the term "health care facility," establish that the Project's primary use is residential and ought to be prohibited. The impacts that neighbors are concerned with—including human waste, food handling, wastewater, and water supply—are primarily controlled by environmental regulations administered by the Agency of Natural Resources and/or DAIL as opposed to local zoning restrictions. Additionally, Confluence's entire proposal underwent a full conditional-use and site-plan review by the DRB to ensure, among other things, that the use would not result in undue adverse effects. The Project's impacts were fully reviewed under the same procedures that applied whether the Project was proposed as a health care facility or any other conditionally allowed use. The DRB determined that the Project complied with, and would not have an undue adverse impact under, the applicable criteria. This process is more rigorous than the review required for residential uses in the Rural Residential district. Therefore, to the extent that neighbors are concerned that an additional permit is required for residential use, the conditional-use and site-plan approval will satisfy these concerns.

¶ 37. Neighbors further assert that each of a project's uses must be allowed within the project's zoning district. 24 V.S.A. § 4414(3)(A); id. § 4473; In re Wesco, Inc., 2006 VT 52, ¶¶ 7-8, 10, 180 Vt. 520, 904 A.2d 1145; Fleury v. Town of Essex Zoning Bd. of Adjustment, 141 Vt. 411, 416, 449 A.2d 958, 960-61 (1982). However, while Confluence's potential uses—therapeutic community residence, recreation, and health care facility—must be allowed under the zoning regulations or Bylaws, the Project does not require conditional-use and site-plan approval for every use. Where one use is a component of another allowed use, additional permitting via conditional-use and site-plan review is not necessary. For example, in In re Howard Center Renovation Permit, this Court determined that counseling therapies provided by a clinic are part of a patient's overall

19

treatment plan, and therefore the owners of an approved medical office were not required to attain additional site-plan and conditional-use review for the provision of counseling services. 2014 VT 60, ¶ 11. The Court found that the substance abuse clinic "[did] not constitute a 'social services' establishment—instead of or even in addition to a 'medical office'—merely because treatment include[d] a counseling component." Id. Similarly, here the Project's inpatient treatment program is not a residential use "instead of or even in addition to" a "health care facility" merely because residing on-site while receiving therapy is a component of the patient's overall treatment plan. Therefore, the residential use does not require separate permitting above and beyond the Project's conditional-use and site-plan approval as a "health care facility," further affirming that the Project may be used simultaneously as both a "health care facility" and therapeutic community residence.

¶ 38. Finally, neighbors claim that the Project impermissibly reestablishes the "therapeutic retreats, conferences, and events" previously hosted on-site by the Church, which neighbors assert were nonconforming uses. Confluence concedes that it cannot reestablish the nonconforming uses previously exercised by the Church. Confluence seeks conditional-use and site-plan approval for the Project, without reliance on prior nonconforming uses. Because we agree this Project is a conditionally approved "health care facility" in its own right, we need not consider this argument.

¶ 39. In conclusion, the absence of a definition for "health care facility" in the Thetford zoning ordinance—the catalyst for this dispute—does not render the term ambiguous or inapplicable to Confluence's Project. While any ambiguity in the zoning ordinance must be resolved in favor of allowing the Project,[6] here we need not rely on the resolution of continuing

---

[6] "[B]ecause zoning ordinances 'are in derogation of private property rights,' they must be construed narrowly in favor of the property owner." In re Lathrop Ltd. P'ship., 2015 VT 49, ¶ 29 (quoting In re Champlain Oil Co., 2014 VT 19, ¶ 2, 196 Vt. 29, 934 A.3d 139). Thus, if the term "health care facility" is ambiguous, we must err on the side of a broader interpretation, including the scope of a therapeutic community residence. This practice ensures that this Court avoids "legislat[ing] in the guise of construction" by inserting a restriction in a zoning ordinance that was

ambiguity to decide this case. To the contrary, the purpose and plain language of the Thetford Zoning Bylaws, as well as the sources discussed above, demonstrate ample support that Confluence's Project is a "health care facility." Therefore, applying our own statutory interpretation to the evidence, we affirm the Environmental Division's determination that Confluence's therapeutic community residence is a "health care facility" under the Thetford Zoning Bylaws and, as such, is an allowed conditional use in Thetford's Rural Residential area.

Affirmed.

FOR THE COURT:

_____
Associate Justice

---

not included by the legislative or municipal body. Murphy Moto Sales, Inc. v. First Nat'l Bank of St. Johnsbury, 122 Vt. 121, 123, 165 A.2d 341, 342 (1960). Evidence of an intent to exclude a therapeutic community residence would have to be direct and specific within the Bylaws. See In re Willowell Found. Conditional Use Certificate of Occupancy, 2016 VT 12, ¶ 19 ("[O]ur precedent requires clear restrictions on land use."). No evidence, much less, specific evidence, of such intent exists. Here, we must resolve any ambiguity in favor of the landowner, and affirm the permissibility of Confluence's Project under the Bylaws' language.