STATE OF VERMONT

SUPERIOR COURT                              ENVIRONMENTAL DIVISION

Docket No. 114-8-17 Vtec

| | |
|---|---|
| **Snyder Group Inc. PUD Final Plat** | |

## Decision on Cross-Motions for Summary Judgment

The present appeal is of an August 1, 2017 approval of a final plat application submitted by Snyder Group, Inc. ("Snyder") issued by the City of South Burlington Development Review Board ("DRB").  The application proposes to construct 47 new dwelling units and maintain one existing dwelling unit, all on property located at 1302, 1340, and 1350 Spear Street in South Burlington, Vermont.  The DRB approved the project as a Planned Unit Development ("PUD").

Neighboring property owners William Gilbert, Maurene Gilbert, Louise Kleh, Michael Scollins, Mary Scollins, Robert Skiff, Marley Skiff, and the Pinnacle at Spear Homeowners Association (collectively, "Appellants") appealed that decision to this Court.[1]  Presently before the Court are Snyder and the Appellants' cross-motions for summary judgment.

Snyder is represented in this matter by Matthew B. Byrne, Esq., Robert H. Rushford, Esq., and Jeffrey O. Polubinski, Esq.   Appellants are represented by Daniel A. Seff, Esq.  The City of South Burlington ("City") is represented by Amanda S. E. Lafferty, Esq.

## Legal Standard

Summary judgment is appropriate where there is no genuine dispute concerning the material facts and a party is entitled to judgment as a matter of law.  V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2).  When considering the facts presented to us, "the nonmoving party receives the benefit of all reasonable doubts and inferences."  Gauthier v. Keurig Green Mountain, Inc., 2015 VT 108, ¶ 14, 200 Vt. 125 (quoting Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356).  When considering cross-motions for summary judgment, the Court

---

[1] We note that Attorney Seff has moved to withdraw as counsel for Maureen and William Gilbert as they have moved from South Burlington and no longer wish to be parties in this litigation.  That motion is **GRANTED** and Mr. & Mrs. Gilbert are relieved of their party status.

We further note that, over the course of these proceedings Louise Kleh passed.

considers each motion individually and gives the opposing party the benefit of all reasonable doubts and inferences. City of Burlington v. Fairpoint Commc'ns, Inc., 2009 VT 59, ¶ 5, 186 Vt. 332.

## Factual Background

We recite the following facts solely for the purpose of deciding the pending motions for summary judgment. Our recitation here summarizes the facts that we have deemed undisputed and material to the legal issues raised by the parties, but should not be mistaken for factual findings, which cannot occur until after the Court conducts a trial. Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000).

1.      On April 27, 2017, Snyder submitted a subdivision application for a PUD. The application proposed to raze one single family dwelling, construct 18 single family dwellings, construct three 3-unit multi-family dwellings, and construct 10 two family dwellings ("the Project"). In total, the Project consists of 48 residential units.

2.      On August 1, 2017, the DRB approved final plat application #SD-17-14 for the Project. See In re the Snyder Grp. Inc. – 1302, 1340 & 1350 Spear St., #SD-17-14, Final Plat Application, Findings of Fact and Decision, at 1 (S. Burlington Dev. Rev. Bd. Aug. 1, 2017) (hereinafter "DRB Decision").

3.      The Project was reviewed and approved pursuant to the South Burlington Land Development Regulations that were last amended on June 27, 2016 ("Regulations").

4.      The Project is located on 25.93 acres at 1302, 1340, and 1350 Spear Street in South Burlington, Vermont. The parcel is in the Southeast Quadrant Neighborhood Residential Zoning District ("SEQ-NR").

5.      Spear Meadows, Inc., 1350 Spear Street, LLC, and Gary J. Farrell currently own the three parcels which comprise the Project. Snyder has an option to purchase the properties.

6.      The Project was approved as a PUD and proposes 48 units, which results in 1.85 units per acre. Snyder seeks to increase the Project's density from the applicable maximum density limit for the zoning district of 31 dwelling units to 48 units by using transferable development rights ("TDRs").

2

**TDR Bylaw**

7. The City has adopted a TDR bylaw, which is set forth in Regulations § 9.05(B) and 9.13(C) (together, "TDR Bylaw"). The Bylaw became effective on April 24, 2006.

8. A municipal TDR bylaw must comply with the statutory requirements set forth in 24 V.S.A. § 4423. 24 V.S.A. § 4423(a) states that:

> (a) In order to accomplish the purposes of 10 V.S.A. § 6301, bylaws may contain provisions for the transfer of development rights. The bylaws shall do all the following:
>
> > (1) Specify one or more sending areas for which development rights may be acquired.
> >
> > (2) Specify one or more receiving areas in which those development rights may be used.
> >
> > (3) Define the amount of the density increase allowable in receiving areas, and the quantity of development rights necessary to obtain those increases.
> >
> > (4) Define "density increase" in terms of an allowable percentage decrease in lot size or increase in building bulk, lot coverage, or ratio of floor area to lot size, or any combination.
> >
> > (5) Define "development rights," which at minimum shall include a conservation easement, created by deed for a specified period of not less than 30 years, granted to the municipality under 10 V.S.A. chapter 155, limiting land uses in the sending area solely to specified purposes, but including, at a minimum, agriculture and forestry.

9. Regulations § 9.13(C) sets forth the basis for the TDR Bylaw. It requires that:

> (a) The applicant shall demonstrate that development rights have been secured and encumbered from lands lying within the SEQ-NRP or SEQ-NRT sub-districts, or adjacent lands on the same tax parcel lying within any sub-district, or from lands acquired by the City or State for the purpose of providing public parks in any sub-district, and EITHER that the sending parcel is sufficiently encumbered against further land subdivision and development through a purchase or other agreement acceptable to the City Attorney to ensure conformance with these Regulations; OR
>
> (b) All encumbered parcels not subject to a permanent conservation easement or restriction of similar binding effect shall be reviewed as components of the PUD and shall be subject to the provisions of this article.

10. It then states in § 9.13(C)(2) that:

> If the conditions of 9.13(C)(1) above are met, the Development Review Board may then approve the assignment (transfer) of all or a portion of the residential development

3

density calculated for a noncontiguous encumbered parcel to another parcel to satisfy the provisions of Section 9.05 above

11. Regulations § 9.05(A) state that the maximum density within the SEQ-NR is 1.2 units per acre. Pursuant to this, the base density of the Project would be 31.12 units.

12. Regulations § 9.05(B) states that the applicable density "within a contiguous development parcel subject to a single PUD or Master plan approval shall not exceed an average density" of 4 dwelling units per acre in the Neighborhood Zoning District. It further notes that "[s]uch average densities may be achieved only under a PUD Planned Unit Development application. See Section 9.13, SEQ Review and Approval Process." Regulations § 9.05(B).

13. Under the TDR Bylaw, the Project would have an allowable density of 103.72 units within at PUD proposal.

14. Snyder applied for approval for 17 development rights to be transferred for the Project. It proposes that the Project is the "receiving parcel" and the Bread and Butter Farm, formerly known as the Leduc Farm, on Leduc Farm Road in South Burlington as the "sending parcel." It proposes a density of 1.85 dwelling units per acre.

**Dead End Street**

15. Snyder proposes a 320-foot-long dead-end roadway, referenced as Street A.

16. Regulations § 9.08(A)(2)(b) state that "[d]ead end streets (e.g. culs de sac) are strongly discouraged. Dead end streets shall not exceed 200 feet in length."

17. Nevertheless, the DRB approved Street A, in part under the possibility that it could be, at some as-yet determined point in the future, connected with another nearby roadway, Vale Drive. It also concluded that § 9.08(A)(2)(b) was waivable.

**Discussion**

Both Snyder and Appellants move for complete judgment all Questions Appellants raise in their Statement of Questions. The Town has filed a brief in opposition of Appellants' motion. Appellants raise five Questions in their Statement of Questions.[2]

---

[2] Four of those Questions have multiple subparts. This results in 37 Questions, including subparts.

Question 1 asks whether Regulations provisions "concerning the purported transfer of development rights, including without limitation [Regulations] §§ 2.02 . . ., 9.05(A)—(B) and 9.13(C) . . ., [are] invalid and unenforceable?" Question 2 asks whether the TDR Bylaw is unconstitutional. Question 3 asks whether the TDR Bylaw is facially unconstitutional, with subparts addressing vagueness. Question 4 asks whether the TDR is unconstitutional as applied, similarly addressing vagueness. Question 5 asks if Snyder's proposed 320-foot dead-end street should be rejected and prohibited. The subparts of each Question address more specific aspects of these broader Questions.

Before addressing the substance of these Questions, we address a threshold argument raised by Snyder: that Appellants lack standing to raise their statutory and constitutional challenges to the TDR Bylaw. We then address the remaining legal issues in turn.

I. **Whether the Neighbors have standing to raise their statutory and constitutional arguments.**

We begin by noting that Snyder's motion is one for summary judgment. However, in substance, it appears to be a, at least in this aspect, a motion to dismiss pursuant to V.R.C.P. 12(b)(1). In this aspect of its motion, Snyder does not seek judgment on any question posed by Appellants in their Statement of Questions but instead challenges their standing to be an appealing party in this appeal.

We first note that "standing is a necessary component of the court's subject-matter jurisdiction." Bischoff v. Bletz, 2008 VT 16, ¶ 15, 183 Vt .235 (citing Brod v. Agency of Nat. Res., 2007 VT 87, ¶ 2, 182 Vt. 234). The absence of subject matter jurisdiction may be raised at any time, including by this Court on its own motion. Id.; see, e.g., Brigham v. State, 2005 VT 105, ¶ 9, 179 Vt. 525 (mem.) (citation omitted).

Therefore, we will review Snyder's motion, solely with respect to the issue of standing, as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. In reviewing such a motion, we accept all uncontroverted factual allegations as true and construe them in the light most favorable to the nonmoving party. See Rheaume v. Pallito, 2011 VT 72, ¶ 2, 190 Vt. 245.

Snyder raises two arguments as to why Appellants lack standing in this matter. First, it asserts that Appellants have not demonstrated that the Project has the potential to result in a physical or environmental impact on their interests, and therefore do not qualify as "interested

5

persons" pursuant to 24 V.S.A. § 4465(b). Second, Snyder challenges Appellants' standing to raise their specific statutory and constitutional arguments. We address these issues in turn.

### a. Physical or Environmental Impact

To qualify as interested persons as Appellants seek to do in this appeal, a showing is required that such persons claiming such status (1) own or occupy property in the "immediate neighborhood" of the subject property; (2) can "demonstrate a physical or environmental impact on his interest under the criteria reviewed"; and (3) "alleges that the decision or act, if confirmed, will not be in accord with the policies, purposes, or terms" Regulations. See 24 V.S.A. § 4465(b)(3). To preserve their status as appellants, an interested person must also demonstrate that they participated in the proceeding below. 24 V.S.A. § 4471.

It appears undisputed that the Appellants participated in the proceedings below and that that they live in the immediate neighborhood.[3] Snyder argues, however, that they have failed to meet their burden of demonstrating a physical or environmental impact on their interests under the criteria reviewed.[4]

An interested person must establish a non-speculative demonstration, or a reasonable possibility, of a physical or environmental impact under the criteria reviewed. In re UVM Certificate of Appropriateness, (Vt. Super. Ct. Envtl. Div. Feb. 26, 2013) (Walsh, J.). (citations omitted) *aff'd by* No. 2013-301 (Jan. 23, 2014). To demonstrate such a possibility, the person or persons "must describe how the development under review will impact him or her specifically (i.e., describe a concrete and particularized injury) and must reference evidence showing that such impact is not hypothetical (i.e., demonstrate an actual or imminent injury)." Id. (citations omitted).

---

[3] Whether Appellants have alleged that the decision on appeal, if confirmed by this Court, "will not be in accord with the policies, purposes, or terms" of the Regulations appears undisputed as well. See 24 V.S.A. § 4465(b)(3).

[4] Snyder appears to argue that the criteria reviewed are not the applicable Regulations, but instead 24 V.S.A. § 4423 and the Constitution, as Appellants raise statutory and constitutional challenges. However, the Project is to be reviewed, as a general matter, under the Regulations, which Appellants contend are improper. Therefore, we conclude, for the general purposes of whether Appellants have standing to appeal pursuant to § 4465, the criteria reviewed are the Regulations. An in-depth analysis of whether Appellants may raise their statutory and constitutional challenges occurs below.

We note that the elements of whether a party is in the "immediate neighborhood" and whether their interests could be affected by a development are closely intertwined. See In re Appeal of Stank & Mulvaney, No. 101-7-01 Vtec, slip op. at 1 (Vt. Envtl. Ct. Oct. 15, 2001) (Wright, J.). It is uncontested that Appellants live in the immediate neighborhood of the Project. Further, Appellants have described alleged impacts that an allegedly improperly increased density would have on their interests, such as increased traffic, noise, light pollution, and adverse aesthetic impacts. These facts have not been controverted, and we conclude that Appellants have alleged a reasonable possibility of a physical or environmental impact under the criteria reviewed.

We decline to require Appellants, as Snyder asserts we should, to "prove" these impacts at this stage of the proceeding. To do so would be to place a higher burden on Appellants than contemplated by the "reasonable possibility" standard. Therefore, we conclude that Appellants may generally appeal the DRB's decision to this Court. We next turn to whether they may raise their statutory and constitutional arguments.

**b. Statutory and Constitutional Arguments**

Snyder essentially asserts that Appellants lack standing to raise their statutory and constitutional arguments because they are not the proper party to raise these issues, Snyder is.

To have standing, a party must show: (1) injury-in-fact, (2) causation, and (3) redressability. Parker v. Town of Milton, 169 Vt. 74, 77 (1998) (citations omitted). "The prudential elements of standing include . . . the requirement that a plaintiff's complaint fall within the zone of interest protected by the law invoked.'" Hinesburg Sand & Gravel Co., Inc. v. State, 166 Vt. 337, 341 (1997) (quoting Allen v. Wright, 468 U.S. 737, 750 (1984)) (citations omitted).

Injury in fact is the "invasion of a legally protected interest." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, (1995) (internal quotations omitted). The determination of whether a party has suffered such an invasion "requires inquiry into the substance of plaintiff's claim." Hinesburg Sand & Gravel Co., Inc, 166 Vt. at 341.

The zone of interest test is "whether the interest sought to be protected by the [party] is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Ass'n of Data Processing Serv. Org., Inc. v. Camp, 397 U.S. 150, 153 (1970).

7

Snyder asserts that Appellants cannot show any of the three elements of standing as related to their void for vagueness argument. It further asserts Appellants are outside the zone of interest with respect to their statutory claim.

Appellants assert that, because it fails to comply with statutory and constitutional requirements, the TDR Bylaw is improper. From this improper bylaw, they assert that they will be injured by an improperly permitted development which permits an increase in density beyond what is otherwise permissible in the Regulations. They further assert that, should the Court conclude that the TDR Bylaw is either improperly enacted or unconstitutional, their injury will be redressed, as the development would be limited to the density available without the use of TDRs.

We begin with the constitutional claim. Neighboring property owners, as a general matter, have interests most often impacted by neighboring development. Further, as stated above, there is a reasonable possibility that Appellants' interests will be impacted by the Project. The TDR Bylaw, if the Court concludes it is void for vagueness, therefore invades their interests as it unconstitutionally permits the increased density of a neighboring property. We therefore conclude that there is a direct link between their injury (i.e., impacts to their respective properties from increased density) and the alleged vagueness.

We decline to adopt Snyder's assertion that only applicants would or could suffer the requisite injury to have standing to raise constitutional challenges to zoning ordinances. Such a conclusion would disregard important interests that neighboring property owners have that may be impacted by a neighboring development.[5] We also have found no precedent that supports Snyder's position.

We further note that, should the Court conclude the TDR Bylaw unconstitutional, Appellants alleged injury would be redressed, as the applicable maximum density in the district would apply as set out in § 9.03. We see no justification, as Snyder suggests, that a conclusion that the TDR Bylaw is unconscionably vague would somehow invalidate the Regulations in its entirety, resulting in no limitations on density, at which time Snyder could construct the Project

---

[5] We further note that the Vermont Supreme Court has previously entertained constitutional challenges raised by neighboring property owners, without addressing the issue of their standing to raise the issue. See In re Peirce Subdivision Application, 2008 VT 100, 184 Vt. 365.

at any density it saw fit.[6]  Therefore, Appellants injury is redressable.  We conclude that Appellants have standing to raise their constitutional challenges.

With respect to Appellants' statutory claim, Snyder has limited its standing challenge, asserting that Appellants are not within the zone of interest and therefore cannot raise their statutory challenges.  We begin by noting we are slightly confused by Snyder's argument.  It appears to assert that Appellants lack standing to challenge § 4423, which is not what Appellants are attempting.  Instead, Appellants challenge the Regulations compliance with § 4432, its enabling statute with respect to TDRs.  Appellants are therefore asserting no legal right under § 4423, but assert such a right under the Regulations.  As neighboring property owners, we conclude that Appellants are within the zone of interests the Regulations seek to protect.[7]  We therefore conclude that Appellants have standing to raise their statutory clams.

Having concluded that Appellants have standing to raise all of their arguments, we turn to the substance of their challenges.

**II.      Whether the City's TDR Bylaw complies with 24 V.S.A. § 4423.**

Zoning ordinances are presumed to be valid.  McLaughry v. Town of Norwich, 140 Vt. 49, 54 (1981).  As such, the Court "will not interfere with zoning unless it clearly and beyond dispute is unreasonable, irrational, arbitrary or discriminatory."  City of Rutland v. Keiffer, 124 Vt. 357, 367 (1964).

However, "[a] municipality has zoning authority only in accordance with, and subject to, the terms and conditions imposed by the state in making the power grant."  Flanders Lumber & Bldg. Supply Co. v. Town of Milton, 128 Vt. 38, 45 (1969) (citations omitted); see also N. Country Sportsman's Club v. Town of Williston, 2017 VT 46, ¶ 12, 205 Vt. 1 ("While municipalities are entitled to create their own regulatory ordinances, those ordinances must conform to statutory standards.") (citing In re White, 155 Vt. 612, 618 (1990)).

---

[6] A more in-depth analysis of this issue is provided below in Section III.

[7]  Much like their constitutional challenge, we note that the Vermont Supreme Court has previously entertained a neighboring property owners challenge to zoning regulations as inconsistent with the relevant enabling statute, though without addressing the argument of whether the neighbor had standing to do so.  See In re John A. Russell Corp., 2003 VT 93, 176 Vt. 520.

Therefore, "[s]tatutes are the state's legislative policies; municipalities are its instrumentalities." Kedroff v. Town of Springfield, 127 Vt. 624, 627 (1969). As such, if "an ordinance does not properly comply with or effectuate a statute, that ordinance should be read to include and effectuate the statute." N. Country Sportsman's Club, 2017 VT 46, ¶ 12.

24 V.S.A. § 4423 authorizes municipalities to use the possible transfer of development rights in zoning ordinances.[8] Section 4423 requires that:

(a) In order to accomplish the purposes of 10 V.S.A. § 6301, bylaws may contain provisions for the transfer of development rights. The bylaws shall do all the following:

(1) Specify one or more sending areas for which development rights may be acquired.

(2) Specify one or more receiving areas in which those development rights may be used.

(3) Define the amount of the density increase allowable in receiving areas, and the quantity of development rights necessary to obtain those increases.

(4) Define "density increase" in terms of an allowable percentage decrease in lot size or increase in building bulk, lot coverage, or ratio of floor area to lot size, or any combination.

(5) Define "development rights," which at minimum shall include a conservation easement, created by deed for a specified period of not less than 30 years, granted to the municipality under 10 V.S.A. chapter 155, limiting land uses in the sending area solely to specified purposes, but including, at a minimum, agriculture and forestry.

In interpreting zoning ordinances, we apply familiar rules of statutory construction. In re Appeal of Trahan, 2008 VT 90, ¶ 19, 184 Vt. 262. First, we "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." Id. (citations omitted). If there is no plain meaning, we will "attempt to discern the intent from other sources without being limited by an isolated sentence." In re Stowe Club Highlands, 164 Vt. 272,

---

[8] The City and Appellants agree that § 4423 is the statutory authority under which municipalities may enact TDR programs. Snyder does not appear to contest that § 4423 authorizes the TDR Bylaw, but also states that there are other sources of authority to enact such a bylaw. Snyder specifically references 24 V.S.A. § 4410, which grants the Town broad authority to enact zoning bylaws, and the City charter.

While it is true that these sources give the City authorization to regulate land use development, neither address TDRs. The Legislature, however, has set forth specific requirements that municipalities must meet to enact TDR programs. We are unconvinced that these broad grants of authorization somehow negate or supersede the Legislature clear directives set forth in § 4423.

10

280 (1995). In construing statutory or ordinance language, our "paramount goal" is to implement the intent of its drafters. Colwell v. Allstate Ins. Co., 2003 VT 5, ¶ 7, 175 Vt. 61. We will therefore "adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578 (quotations omitted); see also In re Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 22 (quoting Lubinsky v. Fair Haven Zoning Bd., 148 Vt. 47, 49 (1986)) ("Our goal in interpreting [a zoning regulation], like a statute, 'is to give effect to the legislative intent.'").

We keep these principles of interpretation in mind as we address whether the TDR Bylaw complies with each subsection of § 4423.

### a. 24 V.S.A. § 4423(a)(1)

Section 4423(a)(1) requires that a TDR bylaw "[s]pecify one or more sending areas for which development rights may be acquired."

Snyder asserts that the Regulations comply with this subsection through § 9.13(C)(1)(a). This section states that an applicant seeking to use TDRs:

> [S]hall demonstrate that development rights have been secured and encumbered from lands lying within the SEQ-NRP or SEQ-NRT sub-districts, or any adjacent lands on the same tax parcel lying within any sub-district, or from lands acquired by the City or State for the purpose of providing public parks in any sub-district.

Appellants disagree. They contend that § 9.13(C)(1)(a) does not comply with § 4423(a)(1) because it does not define "development rights," which the Court analyzes below, or "sending area." They assert that the closest the Regulations get to defining a sending area would be found within § 9.04(C), stating: "Areas designated SEQ-NR, SEQ-NRT, SEQ-VR and SEQ-VC shall be considered development areas. Areas designated SEQ-NRP are designated as conservation areas." They assert that conservation areas are not equivalent to "sending areas," as used in § 4423(a)(1).

The Regulations do not define any area using the term "sending area" nor is the term defined in its own right. However, § 4423(a)(1) does not require such rigidity in this respect. Instead, it requires that a sending area be designated as a location where development rights may be acquired. Here, the Regulations state that development rights must be secured within the SEQ-NRP or SEQ-NRT sub-districts, or adjacent lands on the same tax parcel lying within any

11

sub-district, or from lands acquired by the City or State for the purpose of providing public parks in any sub-district.  Regulations § 9.13(C)(1)(a).  It then goes on to call these lands "the sending parcel."  Id.

We note that in § 9.04(C), SEQ-NRP is designated as a conservation area whereas SEQ-NRT is designated as a development area.  However, this section generally designates the SEQ sub-districts.  Section 9.13(C) is specific to TDRs and non-contiguous PUDs.  It is in this section that the Regulations specify certain areas as sending parcels.  We do not conclude these different designations, one not specific to the TDR program, results in the TDR Bylaw failing to comply with § 4423(a)(1).

Because we must begin our analysis with the presumption that zoning ordinances are valid, and we must read them to effectuate the statute, we conclude that the Regulations comply with § 4423(a)(1) as it identifies "sending parcels" in § 9.13(C)(1)(a).

**b.  24 V.S.A. § 4423(a)(2)**

Section 4423(a)(2) requires that a TDR bylaw "[s]pecify one or more receiving areas in which those development rights may be used."

The Regulations state that, should development rights be obtained within a sending parcel, the DRB "may then approve the assignment (transfer) of all or a portion of the residential development density calculated . . .  to another parcel to satisfy the provisions of Section 9.05 above."  Regulations § 9.13(C)(2).

Snyder asserts that, because Chapter 9 of the Regulations is specific to the SEQ District, and § 9.13(C)(2) identifies any other sub-district of the SEQ District as an area where development rights may be transferred (i.e., a receiving area), the TDR Bylaw complies with § 4423(a)(2).

Appellants assert that the Regulations do not use the term "receiving area" and again direct us to § 9.04(C), which states that "Areas designated SEQ-NR, SEQ-NRT, SEQ-VR and SEQ-VC shall be considered development areas.  Areas designated SEQ-NRP are designated as conservation areas."  It states that the term "development area" does not mean "receiving area."  They further note that § 9.05(b)(2) indicates the SEQ-NRT sub-district as an area at which density

may be increased under § 9.13, but also a "sending parcel" under § 9.13(C)(1), which they assert is in violation of § 4423(a).

The Regulations do not define or use the term "receiving area." However, similarly to our above discussion, § 4423(a)(2) does not require such rigidity. Instead, it requires that the Regulations designate a receiving area or areas as a location where development rights may be used.

Here, the Regulation states that if rights are secured as set forth in § 9.13(C)(1), the DRB may approve the transfer of all or some of those rights "to another parcel to satisfy the provisions of Section 9.05." Regulations § 9.13(C)(2). Regulations § 9.05(B) then states that densities may be increased pursuant to § 9.13 in the SEQ-NRT, SEQ-NR, SEQ-NRN, SEQ-VR, and SEQ-VC sub-districts.[9]

Further, we reach this conclusion despite the fact that the SEQ-NRT sub-district is identified both as a sending area and a receiving area. The statute merely states that a bylaw must identify area or areas as sending and receiving areas. We can find no prohibition that an area may be designated both as a receiving and sending area, as Appellants suggest. We decline to read such a prohibition into the statute.

While never specifically designated as "receiving areas" we conclude that the Regulations satisfy § 4423(a)(2), in that the Regulations specify areas within which development rights may be used.[10]

### c. 24 V.S.A. §§ 4423(a)(3), 4423(a)(4)

Because of the interrelated nature of §§ 4423(a)(3) and (4) we combine our analysis of the TDR Bylaw's compliance with these sections.

Section 4423(a)(3) requires that TDR bylaws must "[d]efine the amount of the density increase allowable in receiving areas, and the quantity of development rights necessary to obtain those increases."

---

[9] The SEQ-NRP sub-district is subject to Regulations § 9.12.

[10] We note that Appellants appear to concede this fact. See Appellants' Motion for Summary Judgement, p. 12 ("Section 9.05(B) . . . specifies the SEQ zones that can receive additional units per acre as part of the Section 9.13 TDR-based density increase (albeit without specifying the zones as 'receiving areas').")

13

Section 4423(a)(4) requires that TDR bylaws must "[d]efine 'density increase' in terms of an allowable percentage decrease in lot size or increase in building bulk, lot coverage, or ratio of floor area to lot size, or any combination."

Because the definition of "density increase" is fundamental to § 4423(a)(3), we begin our analysis with whether the Regulations properly define "density increase." The term "density increase" is not expressly defined in the Regulations, nor is it used. Density in the SEQ district is defined in terms of dwelling units per acre. See Regulations § 9.05.

Appellants assert that the TDR Bylaw does not comply with § 4423(a)(4) both because it fails to mention the term "density increase" and because it does not speak in terms of "an allowable percentage decrease in lot size or increase in building bulk, lot coverage, or ration of floor area to lot size, or any combination."

Snyder asserts that density increase is defined in terms of building bulk or a combination of the enumerated definitions and, as such, complies with § 4423(a)(4). Snyder points out, oddly enough, the definition of the word "define." "Define" means "(1) To state the precise meaning of (e.g., a word or sense of a word), (2) To describe the nature or basic qualities of . . ., (3) To delineate the outline or form of, (4) To specify or fix distinctly . . ., (5) To serve to distinguish." Webster's II New College Dictionary, Define 302 (3rd Ed. 2005). It asserts that, while the Regulations do not use the term density increase, it effectively defines the term.

Section 9.05(B) sets a base density in terms of dwelling units per acre. It then sets forth the maximum density for a lot in an enumerated SEQ sub-districts in the same terms.

While we note that § 9.05(B) speaks in terms of dwelling units per acre, that term does not exist in a vacuum. As a baseline, the Regulations note that, 1.2 dwelling units per acre are permissible in the SEQ district. This is reflected in Regulations Table C-2, entitled Dimensional Standards Applicable in All Districts. This table denotes minimum lot sizes for all of the SEQ sub-districts. See Regulations Table C-2. It notes the minimum lot sizes, and also presents this size in terms of maximum dwelling units per acre. Id. This is presented as 1.2 dwelling units per acre. Id.

Table C-2 also sets forth maximum building heights and percentage of the site which may be covered by buildings, both components of building bulk. See 3 Arden H. Rathkopf et al., Rathkopf's The Law of Zoning and Planning § 54.2 (4th Ed.).

We conclude that the Regulations adequately define "density increase" in terms of dwelling units per acre, since the definition includes both terms of lot size, as related to dwelling units per acre, as well as terms of building bulk. Therefore, we conclude that the Regulations comply with § 4423(a)(4).

We next turn to whether the Regulations comply with § 4423(a)(3) and "[d]efine the amount of density increase allowable in receiving areas, and the quantity of development rights necessary to obtain those increases."

The Regulations give a base density, 1.2 dwelling units per acre, and a maximum allowable density by use of TDRs, which ranges from 4 to 8 dwelling units per acre, depending on the relevant SEQ sub-district that has been defined as a receiving area. See Regulations § 9.05(B). As such, we conclude that the Regulations have effectively defined the amount of density increase allowable in a receiving area, in compliance with § 4423(a)(3).

With respect to the second aspect of § 4423(a)(3), however, the Regulations provide no guidance. Section 9.13(C)(1) states that an applicant "shall demonstrate that development rights have been secured and encumbered" in a sending area. It notes that the parcel must be "sufficiently encumbered against further land subdivision and development." Regulations § 9.13(c)(1)(a). There is nothing in the Regulations regarding how much, either in terms of land mass or parcel size, that would result in sufficient "development rights" to be regarded as an allowable density increase.[11] We therefore conclude that there is no definition of the quantity of development rights necessary to obtain the density increases set forth in § 9.05(B).

For this reason, we conclude that the Regulations do not comply with § 4423(a)(3).

---

[11] Snyder appears to argue that, by adequately describing how much density increase is allowable, the Regulations have satisfied how much development rights must be secured to use TDRs. This argument fails to address that development rights and density increase are two different statutory requirements. Snyder's attempt to conflate the two does not provide a sufficient explanation.

15

**d. 24 V.S.A. § 4423(a)(5)[12]**

Section 4423(a)(5) requires that a bylaw:

Define "development rights," which at minimum shall include a conservation easement, created by deed for a specified period of not less than 30 years, granted to the municipality under 10 V.S.A. chapter 155, limiting land uses in the sending area solely to specified purposes, but including, at a minimum, agriculture and forestry.

The term "development rights" is not defined by the Regulations. The Regulations require that applicants "demonstrate that development rights have been secured and encumbered" in a sending district. Regulations § 9.13(C)(1)(a). It then goes on to say that the parcel must be:

[S]ufficiently encumbered against further land subdivision and development through a purchase or other agreement acceptable to the City Attorney to ensure conformance with these Regulations [or . . .] [a]ll encumbered parcels not subject to a permanent conservation easement or restriction of similar binding effect shall be reviewed as components of the PUD and shall be subject to the provisions of this article.

Regulations § 9.13(C)(1)(a)—(b).

Snyder asserts that development rights are defined as "all or a portion of the residential development density calculated for a noncontiguous encumbered parcel or another parcel to satisfy the provisions of Section 9.05 above." Regulations § 9.13(C)(2).[13]

Appellants argue that the Regulations do not formally define the term, nor do they reference the minimum statutory definition set forth in § 4423(a)(5). Therefore, they assert the Regulations fail to comply with the subsection.

We agree with Appellants; the Regulations are lacking in both respects. Section 9.13(C)(1)(a) states that encumberment could occur "through a purchase or other agreement

---

[12] While we conclude that the Regulations fail to comply with § 4423(a)(3), we include an analysis of compliance with § 4423(a)(5) pursuant to Appellants' Question 1.8.

[13] We note that Snyder additionally argues that defining "development rights" in terms of conservation easements would be illogical. Citing Springfield Terminal Ry. Co. v. Agency of Transp., 174 Vt. 341, 348 (2002) (stating that the Court "will always avoid a statutory construction which leads to absurd or irrational results."). It asserts that, because conservation easements limit development, it cannot be included in a definition of "development rights."

This argument misses the purpose of the term "development rights" and the need for its definition in the context of the § 4423 and TDR programs generally. Development rights are those rights to be secured in a place designated for conservation or limited development, a sending area, and used in area designated for development, a receiving area. As such, the statute directs that the definition set forth the encumberment to be secured in the sending area, for use in the receiving area, at a minimum as including a conservation easement. This is neither irrational or absurd in the context of a TDR program.

acceptable to the City Attorney." There are no references to what type of encumberment would be sufficient to satisfy the Regulations, nor an inclusion of the minimum definition as set forth in the statute. While subsection (b) references a conservation easement, it also mentions restrictions "of similar binding effect." Such a fleeting mention does not remedy the fact that they are patently lacking in this respect.

Snyder argues that we should look to the plain meaning of the words "development" and "rights" pursuant to Regulations Article 2.01. While we could look to the plain meaning of the words "development" and "rights," such an exercise would not result in the Regulations meeting the minimum statutory requirements. It would therefore be a fruitless endeavor.

We therefore conclude that the Regulations fail to comply with § 4423(a)(5). We next turn to whether this and our above conclusions regarding §§ 4423(a)(3) and 4423(a)(5) must result in the invalidation of the TDR Bylaw.

### III. Whether the TDR Bylaw is invalid due to failure to comply with §§ 4423(a)(3) and (5).

Snyder asserts that, even if the Court concludes the TDR Bylaw does not comply with § 4423, it is still valid. Citing In re Walker, 156 Vt. 639 (1991); and In re Duncan, 155 Vt. 402 (1990).

Both the Walker and Duncan decisions reference municipalities that failed to enunciate mandatory statutory requirements regarding conditional use approval standards; specifically, "that a proposed conditional use shall not adversely affect the utilization of renewable energy resources." Walker, 156 Vt. at 639 (citing 24 V.SA. § 4407(2) (repealed eff. July 1, 2004). In Walker, the Court concluded that an "ordinance must be read to include the statutory requirements [set forth in the conditional use statute], and those requirements will govern whether or not they are expressly set forth in the ordinance." Walker, 156 Vt. at 639.

Both cases are distinct from the present matter. Both matters reflected a failure to include an explicit statutory standard, whereas here the statute requires the ordinance to define terms, to which the statute provides varying degrees of direction. The Regulations at issue here fail to provide the necessary direction; an implicit inclusion of a statutory reference does not in this instance cure the omission.

17

We conclude the Regulations fail to comply with § 4423(a)(3) for failure to define the quantity of development rights necessary to obtain increased development rights. Looking to the statute, there is no definition therein, but only the requirement to define. The same is true for § 44239(a)(5). Section 4423 does not lend itself to the same "gap filling" as proposed for the conditional use approval standards examined in Walker and Duncan.

We therefore conclude the TDR Bylaw is invalid. Having reached this conclusion, we address its impact on the pending application.

Regulations § 1.03 states that:

Should any section, sub-section, paragraph, sentence, clause, provision, or phrase of these land development regulations be declared by any competent jurisdiction to be unconstitutional or invalid, such decision shall not affect the validity of any other portion of these land development regulations, except the section in question.

Here, we conclude that Regulations §§ 9.13(C)(1)(a), 9.13(C)(2), and 9.05(B)(2)—(6) do not comply with § 4423 and are, therefore, invalid. Snyder asserts that this conclusion somehow invalidates either the entirety of the Regulations or all density requirements therein. We disagree. Nothing within this decision effects other aspects of the Regulations including, of particular import here, § 9.05(A), which sets forth the maximum allowable density in the SEQ district without the use of TDRs.

Having found no reason to disturb or invalidate § 9.05(A) or any other aspect of the Regulations not above discussed, we conclude that the TDR Bylaw provision is severable from the rest of the Regulations. Therefore, the Project is limited to 31 units.[14]

We next turn to Appellants' constitutional challenges.

---

[14] Snyder argues that, "because land-use regulations are in derogation of property rights, any uncertainty in their meaning must be decided in favor of the property owner." Citing Agency of Nat. Res. v. Weston, 2003 VT 58, ¶ 16, 175 Vt. 573. Under this tenant of statutory construction, Snyder reiterates its assertion that any invalidation of the TDR Bylaw would eliminate density requirements in either South Burlington generally or the SEQ district in particular, and that Snyder would therefore be permitted to construct the Project without limitation. This argument lacks merit for two reasons. First, our above conclusions regarding the TDR Bylaw's compliance with § 4423 is not based in any ambiguity or uncertainty in the Regulations overall meaning. Second, pursuant to the Regulations severability clause, the purported destruction of the non-TDR related density requirements would be improper.

## IV.    Whether the TDR Regulation is constitutional.

Appellants assert that the TDR Bylaw is unconstitutionally void for vagueness both on its face and as applied.

When reviewing a municipal land use decision, we begin with the presumption that a zoning regulation is constitutional.  In re Highlands Dev. Co., LLC, No. 194-10-03 Vtec, slip op. at 13 (Vt. Envtl. Ct. Feb. 2, 2010) (Wright, J.) (citing Hunter v. State, 2004 VT 108, ¶ 31, 177 Vt. 339).  Our approach to complaints of "standardless, arbitrary discretion focuses on the criteria for due process and equal protection."  Pierce Subdivision, 2008 VT 100, ¶ 19 (citing In re Handy, 171 Vt. 336, 345-46 (2000).

We will consider two factors to determine whether a regulation is void for vagueness and thus unconstitutional.  First, we consider whether the regulation is "sufficiently precise that an ordinary person using the means available and ordinary common sense can understand the meaning and comply" and does not leave an applicant "uncertain as to what factors are to be considered by the [municipal panel]."  Rogers v. Watson, 156 Vt. 483, 491 (1991) (citing Brody v. Barasch, 155 Vt. 103, 111 (1990); Town of Westford v. Kilburn, 131 Vt. 120, 124 (1973).  Second, we consider whether the regulation provides standards that sufficiently guide municipal decisions and therefore do not allow for the "exercise of discretion in an arbitrary or discriminatory fashion."  Pierce Subdivision, 2008 VT 100, ¶ 20 (quoting Kilburn, 131 Vt. at 124).

Additionally, a balance must be struck between the flexibility a municipal panel must have in reviewing a specific development proposal and a landowner's right to know what standards govern an application.  See Rogers, 156 Vt. at 491; see also Handy, 171 Vt. at 349; Kilburn, 131 Vt. 124 ("On one hand the standards governing the delegation of such authority should be general enough to avoid inflexible results, yet on the other hand they should not leave the door open to unbridled discrimination.").  Thus, while we must "invalidate ordinances that 'fail to provide adequate guidance" and allow for "ad-hoc decision making that is essentially arbitrary," we will uphold general standards "accompanied by some ability of landowners to predict how discretion will be exercised."  Pierce Subdivision, 2008 VT 100, ¶ 20 (quoting Kilburn, 131 Vt. at 125); Handy, 171 Vt. at 349.  For this reason, we consider regulations in the context of the entire ordinance so that "even if some of the bylaws' objectives are general," it may be constitutional

19

"as long as other provisions impose specific limits to guide and check the [decisionmaker's] discretion." Rogers, 156 Vt. at 491; Pierce Subdivision, 2008 VT 100, ¶ 24 ("By providing both general and specific standards for [] review, the bylaw strikes an appropriate balance between providing guidance to the Commission and avoiding inflexible requirements which would defeat the creativity and flexibility required to effectuate the goals of the [bylaws].")).

Appellants assert that the TDR Bylaw is unconstitutionally vague because it fails to provide any standards for the DRB, or the Court on appeal, to apply when determining whether to approve the transfer of all or some of the TDR-based density requested by an applicant. Further, they assert the TDR Bylaw does not provide any standards for the City Attorney to apply when determining whether a parcel is sufficiently encumbered under § 9.13(C)(1).

Snyder asserts that the TDR Bylaw is constitutional because it sets forth the limited range within which a density can be approved when using TDRs. It also asserts that by providing that the City Attorney must "ensure conformance" with the Regulations, the TDR Bylaw provides sufficient guidance when determining whether encumberment is sufficient.

Section 9.13(C)(2) allows the DRB to "approve the assignment (transfer) of all or a portion of the residential development density" when approving the use of TDRs. Section 9.05(A) sets the maximum allowable density within the SEQ district and § 9.05(B) sets the maximum allowable density through the use of TDRs within the various SEQ subdistricts. As discussed above, there is no guidance on the quantity of development rights that must be secured in order for TDRs to be utilized. Similarly, there is no guidance regarding what the DRB should consider when approving the assignment of all or a portion of the development rights.

A mere maximum and minimum, in the absence of these important aspects of lawful TDR programs, are not sufficiently precise such that an ordinary person could understand how the TDR program works, specifically with respect to the transfer of development rights, and would leave an applicant and those concerned by a proposed development uncertain as to what factors are to be considered by the DRB when determining the transfer of development rights. See Rogers, 156 Vt. at 491.

20

As the Regulations are, in effect, standardless regarding this issue, and lack sufficient guidance for the DRB to employ when making determinations regarding the number of TDRs the DRB will allow to be used in an area.

Therefore, we conclude that the TDR Bylaw is unconstitutionally vague on its face.[15]

## V.  Whether the proposed dead-end street is permissible.

When interpreting a zoning ordinance, we apply the familiar rules of statutory construction.  Trahan, 2008 VT 90, ¶ 19.  A complete review of the legal standards we apply in doing so is set forth above.

Of import to our present analysis is whether the Court affords deference to a municipality's interpretation of its ordinance.  The parties both direct us to In re Confluence Behavioral Health LLC CU.  In that decision, we noted that:

> The interpretation by an appropriate municipal panel of its own zoning regulations can have some import in our analysis.  In re Duncan, 155 Vt. 402, 408 (1990) ("we have consistently held that 'absent compelling indication of error, we will sustain the interpretation of a statute by the administrative body responsible for its execution.'") (citation omitted).  However, as noted above, municipal zoning decisions are appealed to the Environmental Division *de novo*.  24 V.S.A. § 4472(a).  We therefore do not defer to the municipal panel's interpretation of a zoning term when that determination is itself the subject of an appeal.  The exception to this rule is where the municipal panel has established a pattern of consistent interpretation.  In re Korbet, 2005 VT 7, ¶ 10, 178 Vt. 459; 38 Thasha Lane Dev. Water & Sewer Fees Denial, No. 136-9-14 Vtec, slip op. at 4—5 (Vt. Super. Ct. Envtl. Div. Aug. 28, 2015) (Walsh, J.).

No. 15-2-16 Vtec, slip op. at 11 (Vt. Super. Ct. Envtl. Div. Jan. 23, 2017) (Durkin, J.) *aff'd by* 2017 VT 112.

Section 9.08 sets forth "additional dimensional and design requirements" for the SEQ-NR, SEQ-NRN, and SEQ-NRT sub-districts.  Section § 9.08(A)(2)(b) states that "[d]ead end streets (e.g. cul de sac or hammer-head) that are not constructed to an adjacent parcel to allow for future connection are strongly discouraged. Such dead end streets shall not exceed 200 feet in length."  Regulations § 9.08(A)(2)(b).

PUDs are:

---

[15] Having reached this conclusion, we need not reach whether the TDR Bylaw is unconstitutional as applied.

We note that the impact of this conclusion on the application before the Court is identical to that in Section III, above.

One or more parcels of land to be developed as a single entity, the plan for which may propose any authorized combination of density or intensity transfers or increases, as well as the mixing of land uses. This plan, as authorized, *may deviate from bylaw requirements that are otherwise applicable to the area* in which it is located with respect to the area, density or *dimensional requirements* or allowable number of structures and uses per lot as established in any one or more districts created under the provisions of these regulations. The specific requirements of a PUD and the area, density and dimensional provisions that may be modified are defined in each district in which PUDs are allowed.

Regulations § 2.02 (emphasis added).

Snyder asserts that, because the Project is a PUD, the DRB and this Court on appeal may deviate from dimensional requirements pursuant to the definition of PUDs. Therefore, it asserts that the oversized road may be permitted. Additionally, and alternatively, it asserts that the roadway standards are waivable pursuant to § 15.12(D)(5). Appellants disagree, arguing that § 9.08(A)(2)(b) is mandatory and non-waivable. Therefore, it asserts that Street A is impermissible as proposed.

First, we address whether the Regulations permit deviations from § 9.08(A)(2)(b) when permitting PUDs. PUDs, by their definition, permit the DRB, and this Court on appeal, flexibility in imposing land use restrictions. Specifically, their definition states that "dimensional requirements" may be deviated from. Section 9.08(A)(2)(b) is included as a dimensional and design standard for the SEQ district. See Regulations § 9.08. Therefore, by the plain language of the Regulations, § 9.08(A)(2)(b) is the type of requirement that the Regulations contemplated PUDs deviating from in some instances. While § 9.08(A)(2)(b) provides clear requirements on dead-end streets, there is nothing in the Regulations to show that this would not be subject to the flexibility afforded to PUDs by their nature as set forth in Regulations § 2.02. Therefore, we conclude that deviation from § 9.08(A)(2)(b) is permissible with respect to PUDs.

Second, we address whether the § 9.08(A)(2)(b) requirement is waivable.[16] Section 15.12 governs standards for roadways, parking and circulation in PUDs generally. Included in this section is the provision that "[n]othing in this section shall be construed to limit the authority of the DRB to grant waivers of public roadway standards subject to the provisions of § 15.12(D)(4)."

---

[16] Having reached the above conclusion, an analysis of whether § 9.08(A)(2)(b) is waivable is largely unnecessary. However, we reach the issue as it is presented by Appellants' Questions 5.4—5.10.

Regulations § 15.12(D)(5); see also Regulations § 15.12(D)(4) (provisions related to roadway connections to adjacent parcels).

We must begin by noting that, while Appellants present a number of Questions related to the issue of waiver, their briefs in large part do not address the issue. Appellants include the bald assertion that § 9.08(A)(2)(b) is non-waivable, but this appears to be based solely on their interpretation of § 9.08(A)(2)(b) and not how it interrelates with § 15.12(D)(5).

Section 15.12 sets for the "Standards for Roadways, Parking and Circulation" in subdivisions and PUDs. Included in this are roadway criteria in § 15.12(D). Section 9.08, however, sets forth specific dimensional and design requirements in the SEQ-NRT, SEQ-NR, and SEQ-NRN sub-districts. Neither section reference one another, nor is § 9.08(A)(2)(b) identified as a public roadway standard, but instead a component of street, block and lot patterns within the enumerated sub-districts.[17]

Other than the fact that § 9.08(A)(2)(b) relates to roadways, we can find no interpretation that supports the conclusion that it can be waived pursuant to § 15.12(D)(5). As such, we conclude that § 9.08(A)(2)(b) cannot be waived. This conclusion, however, does not disturb our above conclusion that the DRB may deviate from § 9.08(A)(2)(b) when permitting PUDs.

## Conclusion

For the above stated reasons, we conclude that the TDR Bylaw is invalid as it does not comply with 24 V.S.A. § 4423. We further conclude that the TDR Bylaw is unconstitutionally vague. Finally, we conclude that the DRB, and this Court on appeal, may permit a roadway longer than 200 feet in length in the context of a PUD application.

This concludes the matter before the Court. A Judgement Order accompanies this Decision.

---

[17] Snyder asserts that the Town's conclusion that § 9.08(A)(2)(b) is waivable is entitled to some deference. However, having received no indication of consistent application of this interpretation and the matter being the subject of the present appeal, we afford this interpretation no deference. See Confluence Behavioral Health LLC CU, No. 15-2-16 Vtec, slip op. at 11 (Jan. 23, 2017).

Further, to the extent Snyder asserts that other oversized dead end streets have been approved pursuant to § 15.12(D)(4) for future interconnection, because we reach the above conclusion that the DRB may deviate from § 9.08(A)(2)(b), we conclude that an analysis of this issue is unnecessary.

Electronically signed on February 28, 2019 at Brattleboro, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division